ROBERT E. WERNER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 6101. Promulgated June 7, 1946.

*Arthur L. Evely, Esq.*, for the petitioner.
*Lawrence R. Bloomenthal, Esq.*, for the respondent.

### OPINION.

HILL, *Judge*: The only question for our decision is whether the profits from Tri-State's operations are taxable as income to petitioner or to petitioner's wife. Respondent contends that petitioner is taxable on such profits, relying on the broad principles enunciated by such cases as *Lucas* v. *Earl*, 281 U. S. 111; *Helvering* v. *Horst*, 311 U. S. 112; and *Higgins* v. *Smith*, 308 U. S. 473. Respondent, on brief, argues that "While there has been no formal assignment of the right to receive money or property in the present case, the respondent views the facts here as having the same effect as an anticipatory assignment of income to be derived by the petitioner from an investment of his capital." Petitioner contends that Tri-State's profits are taxable to his wife. Petitioner argues that, since the physical assets of Tri-State were the property of Wilma, the income derived therefrom is taxable to her.

We think the income in question is taxable to the petitioner. The facts in this case, in our opinion, clearly indicate that the income in question was derived from the *use* of Tri-State's assets rather than from the bare legal title or *ownership* thereof.[1] See *Albert Nelson*, 6 T. C. 764. In our view of the instant case the income in question was essentially created by the use of Tri-State's assets in conjunction with talents, skill, experience, and organization originating with and controlled by the petitioner. The bare legal title to such assets, we think, was not the essential element in the production of such income under the circumstances.

Petitioner admits that his wife did not have the requisite technical knowledge to manufacture metal-cutting tools or to operate Tri-State's affairs. It is also admitted that petitioner's wife did not attempt to exercise any business control over Tri-State's operations. When Gibson was asked what Wilma Werner did when she visited the plant, he testified:

There wasn't much that she could do. She wandered around and talked to a few people or fellows; she did not interfere with production. She asked me how things were coming.

---

[1] Section 22(a), Internal Revenue Code, in so far as here pertinent, provides as follows: "(a) GENERAL DEFINITION.—"Gross income" includes gains, profits, and income derived from * * * businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the *ownership* or *use* of or interest in such property * * *." [Italics supplied.]

Wilma testified at the hearing that she took an active interest in Tri-State only in so far as social work was involved. In this connection Wilma testified on direct examination as follows:

A. Well, at the time that I started the factory in Angola, living conditions for many of the people there were quite poor. Many of the men were out of work for some time. I tried to see to it that living conditions were better, and sometimes I even tried to help in the health situation. I am a registered nurse and I am well enough able to advise them in different things.

Q. Did you interest yourself in the families of the employees?

A. I certainly did.

Q. In what respect?

A. I took a great interest in the coming of any new baby. I also tried to visit them and help them, if possible. I tried to get them together in social groups so that we could get to know each other better.

Petitioner does not seriously contend that Wilma had any direct connection with the management of Tri-State. Petitioner, however, argues that Wilma hired Gibson as her agent to control and manage Tri-State's operations. It is significant, we think, that Gibson was a former employee of Equipment Co. and that he was highly recommended by petitioner for the job with Tri-State. It is also significant that Gibson, when purchasing the machinery and equipment for Tri-State, and when other problems arose, consulted petitioner and other employees of Equipment Co. for advice and assistance. Gibson testified that he knew that petitioner was financially backing Tri-State.

The interrelation and coordination between Tri-State and Equipment Co. and Tri-State's dependence on Equipment are further evidenced by the operating procedure adopted. Equipment Co. benefited from a secured and controlled source of supply. All Tri-State's original and subsequent operating purchases were made by Gibson through Equipment Co.'s purchasing agent. All Tri-State's disbursements were made by Equipment Co. Equipment Co. purchased the entire output of Tri-State. The resulting profit was recorded on the books of Equipment Co. in a manner similar to that used by a mother corporation with respect to a subsidiary. Under those circumstances, we think it is clear that Tri-State's capacity to earn profits depended in a very large measure on its relationship to Equipment Co. It is difficult for us to believe that Tri-State would have had such income-producing capacity had it been divorced from Equipment Co. We think Tri-State's business vitality depended upon and was nurtured by the matrix of Equipment Co.'s established position and "know-how."

Nor is it, in our opinion, without significance that during the taxable year Tri-State's profits existed only as a credit entry on Equipment Co.'s books. Not until February 1942 was there any cash distribution of such profits. Such profits when distributed were de-

posited in a joint account on which petitioner had the right to draw, although such right was never exercised. During 1942 Wilma withdrew from the joint account substantial amounts of Tri-State's profits which had been deposited. The manner in which these withdrawals were expended by her has been set out in our findings of fact. Considering all the surrounding circumstances of this case, we think it is significant that much of such money was spent for purposes which otherwise would have been petitioner's responsibility. Wilma Werner, prior to the establishment of Tri-State, had had no appreciable income of her own. Had it not been for the income Wilma received from Tri-State and spent for the purposes mentioned above, petitioner would have unquestionably borne a larger measure of such expenses personally. These circumstances suggest to us the familiar theme of reallocation of income within the family group.

Petitioner, prior to the establishment of Tri-State, had financed other concerns which engaged in the manufacturing or jobbing of metal-cutting tools. These concerns which were financed by petitioner sold their output to a large extent to Equipment Co. Such firms were managed by experienced business or technical men. Petitioner shared in the profits of those concerns. It is difficult for us to believe that, had petitioner been dealing at arm's length with a stranger in establishing Tri-State, he would have reserved no interest in the profits for himself or that he would have permitted the entire profits to go to such person, particularly if such person had no business or technical ability. Thus, in the instant case, there is not only an absence of any legitimate business purpose to explain the arrangement adopted, but such arrangement seems actually hostile to and inconsistent with ordinary business prudence.

Under the view we take of the case we think "The question is controlled by the cardinal rules of the law of Federal income taxation that income is taxable to the person who earns the income, *Lucas* v. *Earl*, 281 U. S. 111; *Burnet* v. *Leininger*, 285 U. S. 136; and that he who enjoys the economic benefit of income is taxable thereon, *Helvering* v. *Horst*, 311 U. S. 112; *Helvering* v. *Eubank*, 311 U. S. 122." *Wade Allen*, 6 T. C. 899. We think the situation in the instant case is substantially similar to that involved in the recent case of *Albert Nelson*, *supra*, wherein we said:

Income may be derived from dealings in property growing out of the "ownership" or the "use" of such property. Ownership may be in one person and the right to the use of the same property may be in another, with income flowing to each. To one it would be income growing out of the ownership of such property and to the other income growing out of the use of such property. Although legal title of the hotel property was in petitioner's wife, it does not follow that she was entitled in 1941 to the income growing out of the use thereof. * * *

In the instant case, we think it is sufficiently clear that petitioner's wife merely held a bare legal title to Tri-State's tangible assets. We think it is equally clear that the income involved was not derived from mere ownership. Wilma Werner, though the title holder, did not engage in the business which created the income. As we said in *Wade Allen, supra:*

> The determinative factor is that the wife of petitioner, alleged to have operated and conducted the business, as the manager and *entrepreneur,* did not devote any time in the taxable year to the business, and that she had not devoted any vital skill or capital or managerial services to the business in prior years. She had not developed the business. Petitioner did. See *Commissioner* v. *Tower,* 327 U. S. 280, wherein the Supreme Court speaks of the tests to be applied to determine whether or not a wife has been engaged in a business so as to be regarded as the earner and owner of income. Those tests are said to be (1) the investment of capital originating with her; (2) substantial contribution to the control and management of the business; (3) the performance of vital additional services. Applying these standards to this case, it is concluded that the facts do not support a finding in this case that the wife of petitioner was engaged in the business in question in 1941.

We hold that respondent correctly included Tri-State's profits in petitioner's income for 1941.

Reviewed by the Court.

*Decision will be entered for the respondent.*

BLACK, *J.*, dissents.

---

VAN FOSSAN, *J.*, dissenting: The majority view purports to be based on two well accepted rules of law that "income is taxable to the person who earns the income," and that "he who enjoys the economic benefits of income is taxable thereon." With these premises no one can quarrel, but, when these rules are applied to the facts in this case, I find myself in wide disagreement with the majority.

The genesis of the Tri-State enterprise was Mrs. Werner's desire to create an independent industrial activity. The fact is that from first to last Werner meticulously abstained from interference with the new organization. It is undoubtedly true that Mrs. Werner lacked the technical experience and training personally to operate the new business. The same can probably be said of thousands of corporate executives. The genius of executive capacity lies in the ability to select qualified technical assistants to whom to delegate authority and responsibility. Thus, in the case of Tri-State the practical operating head of the business was Gibson, but Gibson was picked out by Mrs. Werner, employed by her, and was solely responsible to her. Management of a business by an agent or employee does not divest the true owner of a business of his rights to the profits. Thus it is that it can not be said that petitioner "earned the income" in question.

Likewise, I am unable to see any basis for saying that the petitioner enjoyed the economic benefits of the Tri-State operation. After Mrs. Werner had paid back the advances by Equipment out of profits, she drew down the profits and used them as she deemed desirable, without dictation by her husband. The petitioner received none of them, nor did he enjoy any indirect benefit, unless it be the pleasure of seeing his wife succeed in her own right. Surely this is not taxable.

The majority also says that "the income in question was derived from the use of the Tri-State assets rather than from the bare legal title or ownership thereof," and thereon in part rests its conclusion of taxability. As to the quoted observation there can be no disagreement, but the use of Tri-State's assets was in no sense directed or dictated by the petitioner. It was solely controlled by Mrs. Werner, through her manager, Gibson.

It is doubtless true that the two companies, Tri-State and Equipment, worked in complete harmony. I see nothing sinister in that fact. The initial capital funds required by Tri-State were advanced by Equipment and carried on its books as an account receivable. Likewise, Equipment purchased materials needed by Tri-State and charged their cost against the Tri-State account. However, Equipment in turn purchased the entire output of Tri-State and offset the selling price thereof against the cost of equipment and materials furnished to Tri-State. During 1941 the entire amounts so advanced were repaid by such offsets and at the end of the year the Tri-State account showed a net balance of more than $4,000 in its favor. Thus, the entire cost of the Tri-State plant was paid for out of profits. If the conclusion which the majority announces is correct, then any company which loans an operating company needed capital and accepts manufactured goods in payment is chargeable with the tax on the income earned by the debtor company.

The evidence presented at the hearing shows clearly that Mrs. Werner chose, and entered into, the tool business as her own free and independent enterprise. After investigation, she chose the site of the factory. She, herself, selected Gibson as her manager and, relying on his knowledge and skill, gave him complete charge of the plant. The petitioner had nothing whatsoever to do with the final decisions thus involved. The war in Europe was in progress and there was a great demand for metal-cutting tools. Gibson proved to be a "splendid" manager and the venture was successful. The record establishes beyond cavil that the petitioner had no voice in the management of the new enterprise.

In order to support its conclusion in the case, the majority discredits the frank, uncontradicted testimony of witnesses who spoke freely,

even if the facts appeared against their own interests, and substituted its own view as to "what must have happened."

Having presided at the hearing and had ample opportunity to observe the witnesses, their demeanor, and the obvious truth of their testimony, I believe them. It is my conviction that the conclusion of the majority is justified neither in law nor in fact. I therefore dissent.

ARUNDELL, *J.*, agrees with this dissent.