OPINION. Disney, Judges (1) The petitioner contends that all matters here involved are barred by the statutes of limitation. We note this matter at this time because, of course, if statutes of limitation apply, consideration on the merits is not in order. It is clear, however, that if we should find that petitioner had income as charged by the respondent, he omitted from his returns more than 25 per cent of the amounts of gross income stated therein, in which case the 5-year period of limitation would apply under section 275 (c) of the Internal Revenue Code, at least as to all years except 1936, since the jeopardy assessments were made on February 21, 1942, less than 5 years from the filing of returns for all taxable years, the deficiency notice issued on April 21, 1942, within 60 days thereafter (in Docket 111028), and the deficiency notice issued on March 13, 1942, for the year 1938. Moreover, if, as the respondent urges, the returns were false or fraudulent, with intent to evade tax, no statute of limitation applies. Sec. 276 (a), I. R. C. We, therefore, for the present, pass the question of statutes of limitation until we have determined whether or not there was income to the petitioner, and whether the returns were false and fraudulent, with intent to evade tax; after which we shall state our conclusions as to the statutes of limitation. (2) The petitioner urges, first, so far as the case on the merits is concerned, that the Government of the United States having, through the Securities and Exchange Commission, in an injunction case at Boston, and the Department of Justice, in the criminal case, having elected to treat the “PLs” as loans, the respondent here is concluded from treating them otherwise. This is, of course, not a plea of res adjudicata or estoppel by judgment. Reliance is placed in the main upon Hoe & Co. v. Commissioner, 30 Fed. (2d) 630, and Brown v. Commissioner, 54 Fed. (2d) 563. The facts relied on in this particular were those involved in the injunction suit filed at Boston by the Securities and Exchange Commission against petitioner and others, and those in the criminal prosecution. Examination of the injunction suit reveals that, instead of electing to treat the “PLs” as loans, the bill of complaint and supplement to the complaint both say: “transaction described by the defendants as ‘personal loans.’ ” The supplement also refers to various other oral and written evidence of the indebtedness arising out of such “personal loans.” It is clear that the facts as to the injunction suit, negative, rather than bear out, the petitioner’s contention on this point. The Securities and Exchange Commission did not elect to treat the “PLs” as loans, but only observed and followed defendants’ designation of them as such. With reference to the election urged, as based on the procedure in the criminal case, it is true that the facts disclose many references to loans. They are found in the indictment by the grand jury, opinion of the court on demurrer to indictment, briefs by Government counsel, charge to the jury, and opinion affirming conviction. Such references in the indictment by the grand jury, charge to the jury, and opinion by the courts appear to us no basis of election by the United States. They are not statements by its representatives. (We hereinafter discuss them as indicia of estoppel by judgment.) The references and expressions in briefs by Government counsel are, of course, of a different nature and do express a view by counsel for the United States. But examination of the brief of Government counsel on petitioner’s demurrer to the indictment reveals that reference.to loans are references to the language of the indictment where that term was used, in almost all cases. Obviously, such references do not constitute an election to treat the ‘'loan” as such. A letter-brief by Government counsel does refer to loans, but only after initially referring to them as “so called PL or CD loans,” so that it is apparent that no unequivocal stand on the matter was therein taken. A supplemental brief again refers to the “so called PL and CD loans,” though other references are made to loans, particularly in connection with recitation of what the indictment charges. Considering these briefs on the demurrer to indictment as a whole, they clearly constitute no election by Government counsel to recognize the “loans” as such. A brief filed in the Circuit Court on appeal is likewise relied on for the election. Though therein there are references to loans, again we find that they are in fact largely references to terms used in the indictment, charge to the jury, and evidence. Though some of the references are not so limited, in our opinion, the United States can not fairly be charged, in that brief, with having made the election urged. They are descriptive and narrative of what had occurred, and had been referred to by the grand jury, rather than admissions or position taken on the nature of the transaction. It would appear very difficult for counsel to refer to or discuss the transactions previously referred to by grand jury and court as loans, and to discuss the facts and distinguish between transactions referred to as loans by grand jury or court and the transactions themselves, without calling them loans. We do not think the appellations constitute election. The questions there were whether there was a security sold in violation of the act, and whether money was obtained by false pretenses through interstate communication, in which latter case loan would have been immaterial. The Hoe case and Brown case, supra, also Ernest Strong, 7 T. C. 953, do not, in our view, parallel the situation here. There the Government sought to take diametrically opposite views at different times, but in this matter, in the criminal case, the question was not the same as the question of loan or income here involved; but the question was one where loan was immaterial (under counts 2-15) and, secondly, one whether there was sale of a security. We conclude that the respondent’s position is not precluded by election. We next consider the contention, made by both parties, that the judgment of conviction of petitioner is basis for estoppel by judgment. The petitioner says it determines for us that the “PLs” were loans, therefore did not represent income; the respondent says that the conviction for violation of the Securities Act, on counts 16,17,18, and 21, estops the petitioner from denying that the money was obtained under false and fraudulent pretenses, in the sale of securities, through interstate commerce or the mails, that, though in form loans, they were not such, and that it was thereby determined that the receipt of such money by petitioner was income to him, and not loans. The parties agree that estoppel by judgment applies in this civil case, though from a verdict in a criminal case, and such is the law. Local 167, International Brotherhood of Teamsters v. United States, 291 U. S. 293 (injunction suit under Sherman Act involving facts as to which there was former conviction); Austin v. United States, 125 Fed. (2d) 816 (former conviction proved in civil case); Diamond v. New York Life Ins. Co., 50 Fed. (2d) 884 (same); Frank v. Mangum, 237 U. S. 309, where the court (in a case of facts in connection with former conviction shown in habeas corpus procedure) said: * * * It is a fundamental principle of jurisprudence, arising from the very nature of courts of justice and the objects for which they are established, that a question of fact or of law distinctly put in issue and directly determined, by a court of competent jurisdiction cannot afterwards be disputed between the same parties. Southern Pacific Railroad v. United States, 168 U. S. 1, 48. The principle is as applicable to the decisions of criminal courts as to those of civil jurisdiction. * * * The petitioner’s view has as basis the repeated use of the words “loans” or “personal loans” in the trial of the criminal case, in indictment, evidence, instructions, charge, opinion, on demurrer to indictments, and opinion on appeal. We have carefully reviewed the use of these expressions, and considered them in the light of the statutes the violation of which was charged, and we conclude that the use of “loan” or “personal loan” is not determinative that there was estoppel against the respondent to deny that there was not loan, but income. “Personal loan” was the term often used on the “PLs” and “loan” was variously used in the history of the case, so that the terms appear to us as descriptive and as vehicles of thought to express what had occurred, or had been referred to, and not as determinative of a fact binding in this adjudication of a different cause of action. The question involved in the criminal prosecution was first (counts 2-15) whether the petitioner through the mails obtained money by false pretenses, and second (counts 16, 17, 18, 20, 21) whether in the sale of securities through such interstate commerce or mails he employed a scheme, device, or artifice to defraud. As to the first, the petitioner could' be guilty, because of use of false pretenses, even though he was only procuring a loan, Commonwealth v. Schwarts, 18 S. W. 775, but could be guilty even though there was no loan, so that conviction on counts 2-15 throws no light, and affords no estoppel, as to whether petitioner made loans, and respondent, on brief, bases his position only on conviction under the Securities Act. Counts 16,17,18, 20, and 21. As to these counts, the question was merely whether the terms of the act were violated. It could be, if fraud was employed in the sale of a “security” through use of the mails or interstate commerce, to paraphrase the statute. “Security” by statutory definition included, inter alia, “evidence of indebtedness” and “investment contract.” The definition did not include “loan.” It did include “note,” of which more hereinafter. It is obvious, we think, that “evidence of indebtedness” is not limited to “loan” so that the words “security, to wit, a certain evidence of indebtedness” in the indictment does not require a conclusion of loan. Estoppel by judgment requires an issue “necessarily involved” in the judgment, and that means that “without the determination thereof the action could not have been determined.” Knutson v. Ekron, 5 N. W. (2d) 74; 50 C. J. S. 209-212. Certainly, considering the breadth of the statutory definition of securities, the verdict against petitioner could have been rendered without determination that there were loans. Therefore, considering the text and the plain objective of the statute, we come to the conclfision that the mere use of the word “loan” or “personal loan” in the course of the criminal procedure in describing what had occurred does not demonstrate determination that the “PLs” were loans and, therefore, did not represent income. To so hold would be to make descriptive terms more important than the statutory requisities of the indictment and conviction. Plainly the jury could convict on the ground that an “investment contract” or some other instrument included in the statutory definition of “security” had been, through fraud and through the mails, the subject of “sale” without concluding that the “PLs” wqpe loans. Turning now to the respondent’s contention: Does the conviction of employing fraud in selling securities through interstate commerce or the mails carry a determination, binding here, that the “PLs” were not loans? The problem has entailed much study. It seems patent that one may not be convicted merely of obtaining a loan (except by false pretenses, covered by counts 2-15, not just here being considered). Petitioner was, however, also convicted on the later counts, under the charge of use of fraud in sale of securities through interstate commerce or mails. Therefore, petitioner was convicted of something more than or different from merely obtaining loans through false pretenses through the mails. So far as that charge is concerned, counts 16,17,18, 20, and 21 were superfluous, for petitioner had already been so charged in counts 2-15. As concerns inclusion of “note” in the definition of security, even if we assume that a “PL” was a “note,” we consider it clear that the Securities Act was never intended to require prosecution of one for merely giving his own note, though fraudulently and through the mails; not only because the Mail Fraud Statute (counts 2-15) covers such actions (as is shown by the conviction on those counts), but because of the essential meaning of “sale.” To be convicted under the later counts the petitioner must have employed fraud “in the sale of securities.” But the ordinary meaning of sale is transfer of property for money. Williamson v. Berry, 49 U. S. 495. Petitioner, if he merely borrowed money, as he contends, received money, but be did not transfer property. He would in such case only promise to repay the borrow. In Commissioner v. Spreckles, 120 Fed. (2d) 517, it was held that, where the holder of a promissory note and mortgage on realty surrendered it, there was no sale or exchange of a capital asset. In Bingham v. Commissioner, 105 Fed. (2d) 971, it is essentially the same. Again, in Hale v. Helvering, 85 Fed. (2d) 819, the court, quoting Words and Phrases that a sale is a transfer of property for money, held that the compromise of a suit to collect on a mortgage note and turning over of the note to the maker were not a sale or exchange to the maker. If one receiving back his note in consideration of surrender of property or settlement is not making a sale, surely, in borrowing money the mere giving of a note, or a receipt such as here involved, is not a sale. The jury, however, found petitioner guilty of fraud in the sale of a security; therefore, found that he did not merely borrow on his note, or receipt, or whatever the “PLs” may be regarded, but in selling securities used fraudulent device or scheme. We conclude that the Securities Act may not be considered to include one’s own “note,” or the “PLs” here involved, in securities, or the giving thereof in securing a loan as a “sale” of such security. In short, petitioner was not convicted, on counts 16,17,18, 20, and 21, of securing a loan through fraud and the mails. In overruling the demurrer to the indictments, the trial judge, discussing the Securities Act counts, quoted Securities and Exchange Commission v. Universal Service Assn., 106 Fed. (2d) 232: * * * But decisions uniformly hold that in determining whether a particular instrument is a security within the meaning of the act the substance of the transaction and of the relationship between the alleged issuer and alleged security holder will control as against the form of the alleged security. * * * Later, the trial court observes that, “we must recognize that the Congressional intention is to give effect to substance and not to form.” This means, in our view, that, in overruling the demurrer and later letting the matter go to the jury, the trial court recognized that whatever the form of the transaction — in form of loan or something else— the jury was to decide whether in reality and fact there was fraud in the sale of securities. By convicting, the jury held that in truth, considering “the substance of the transaction and of the relationship” between the parties, there was not mere innocent borrowing of moneys, but fraud in a selling of securities. Even assuming that the jury considered the matter to have the form of loan, it concluded that there was not loan in fact, but a prohibited fraudulent sale of securities. The petitioner here is in the position of urging that, despite the jury’s verdict, there was loan — in short, that, despite verdict deciding that there was no loan in reality, nevertheless the form of loan controls here. In tax cases it has been held, in cases so numerous as not to require citation, that taxation is a realistic matter, and that we look through form to substance to ascertain the true rather than the seeming situation, in application of the internal revenue law. That there may have been loan in form is, therefore, not conclusive; and the jury, having under instructions viewed the facts and having necessarily found that regardless of form of transaction there was in reality a sale of a security described in the statute, that fact has been determined for us. The verdict, that there was fraud in the sale of securities, is wholly inconsistent with petitioner’s view that the money was only borrowed. If there was a sale the petitioner received, as his own, the proceeds thereof, and comes within those cases which hold there is taxable income if money is received under claim of right. North American Oil Consolidated v. Burnet, 286 U. S. 417; National City Bank v. Helvering, 98 Fed. (2d) 93. That those parting with their money might recover is not decisive. Akers v. Scofield, 167 Fed. (2d) 718. Moreover, the verdict means that the pieces of paper handled, called “PLs” or receipts, were not, in effect, notes as petitioner’s view would have it, but merely means or artifices to defraud. Had they been found to be promises to pay representing loans, conviction on counts 16, 17, 18, 20, and 21 (as distinguished from conviction under counts 2-3, 5-8, 10-15) would not have been sustainable. We conclude and hold that the petitioner is estopped by the verdict on counts 16, 17, 18, 20, and 21 in the criminal case to assert that the “PLs” were loans. This contention being the gist of the petitioner’s contention, on the merits, that the “PLs” did not result in income, we hold because of the estoppel that they did produce income to him. Moreover, we hold, on all the facts, that petitioner had income from the “PLs” and “CDs” and not mere proceeds of loans. Though we sustain the plea of estoppel by judgment by the respondent and hold that the moneys collected were income, we do not consider that it follows that we should sustain objection to the evidence along that line adduced by the petitioner, because such evidence is so tied in with and necessary to consideration of the issue as to fraud and penalties, and to some extent the Golden Braid Co., that it should not be stricken. The whole record requires examination on the question of fraud and penalties. The verdict is not conclusive as to liability for the penalties. Helvering v. Mitchell, 303 U. S. 391. We have, moreover, considered the matter on the facts adduced by such evidence. (3) We are convinced, from all the evidence before us, that petitioner exercised such power and control over Golden Braid’s stock and operations that its dividends and disallowed salaries were taxable to him. The organization and operation of the company was merely one of the many ways designed by petitioner to relieve his followers of their money. We are convinced that he had the utmost confidence in his sister, Mrs. B. M. Mason, and his then secretary and, later, wife, Josephine T. Drew. Mrs. Drew was the divorced wife of Clement O. Drew, one of petitioner’s key workers in the “PL” work. The original investment in the company was purported loans to these two of “PL” funds. The record contains no indication that the loans were repaid. Other than the fact that Josephine T. Drew was its president and Mrs. B. M. Mason was its vice president, there are no facts to indicate what duties were performed by them, or Mrs. Mason’s daughters, each of whom drew salaries of $200 per month. The fact that Josephine T. Drew was allocated a salary of from $17,250 for 1938 to $18,750 for the year 1940 and her successor (Elkin), who was elected president at the end of 1940, assumed the same position at a salary of $150 a month, is strong indication that the large salary paid her was not paid for services rendered to the corporation, particularly in view of the fact there was no indication in the record that the change in presidents caused a change in the duties for the office. The fact that the salary of this office was cut from $18,750 a year to $1,800 a year is of great significance, since Elkin, as far as the record is concerned, acquired the complete interest of his predecessor, Josephine T. Drew. If actually he succeeded to all her rights, title, and interest in the stock and the same duties as president, it would seem logical that he would also succeed to her salary, if the matter was in good faith under his control. We are also confronted with the facts that the 160 shares of stock held by Josephine T. Drew (worth ($85,000) passed to Elkin for $16,000, the $16,000 being supplied by petitioner out of “PL” funds; further that the stock was endorsed in blank, placed in a safe in the office of Golden Braid, and Cook (one of petitioner’s close associates) was informed. Elkin had been a member of the national board of governors of the Mantle Club and was active in the “PL” campaigns. These facts indicate that the control of the company was in someone other than the stockholders; and they fail to show the amount of services performed by the petitioner’s sister, nieces, and wife-to-be. A clearer insight as to who controlled Golden Braid is gained by considering the facts in regard to sales of the costumes it produced. Petitioner had complete control of the Mantle Club. Golden Braid’s only customer was the Mantle Club (through its national board of governors), and the only costume it made was the one worn by full members of the Mantle Club. The total cumulative number of full members December 31,1940, was 14,895, the actual net number at that date was 10,772. The number of costumes purchased by the Mantle Club through its national board of governors at that date was 43,318; while the number of costumes purchased by the Mantle Club members from the club at that same date was 12,413. From all this, we conclude that through the influence of petitioner money from the Mantle Club was channeled into Golden Braid and thereby made available for distribution. We are of the opinion that Golden Braid was merely another element in petitioner’s scheme to divert the funds out of the hands of his followers into his own or to those of his choice. The fact that he was taking care of his sister and her family and that he wanted to “save” Josephine T. Drew and to put her in an “independent position” convinces us that it was his choice that they received the money from Golden Braid in the manner aforementioned. We note that petitioner married Josephine T. Drew December 29, 1940. Petitioner argues that no evidence has been offered to justify including the salaries disallowed as a part of petitioner’s taxable income in accordance with article 23 (a)-7 of Regulations 94 and 101, which provides: * * * In the absence of evidence to Justify other treatment, excessive payments for salaries or other compensation lor personal services will be included in gross income of the recipient and subjected to both normal and surtax. The error of petitioner’s argument is that the regulation cited is to control when the “recipient” is considering what will be included in his gross income. Such an overpayment might be classified as a dividend payment; it might be shown that it constitutes payment for property or the like. Such a provision is not controlling here, where respondent is contending that petitioner exercised such control over these payments that such payments constitute income on his part. “* * * it is the power which the taxpayer has over property which determines his taxability on income therefrom.” Leonard Mark, 47 B. T. A. 204. Perhaps in the usual case of this type the control is by a stockholder or one exercising power through a trust instrument. Even though there was no control exercised in the instant case through actual stock ownership or through a trust instrument, there was a means of control exercised by petitioner as effective as if he actually had title to the stock. With such control exercised by petitioner, we think it proper that he be taxed on the dividends and certain portions of the salaries of Golden Braid under the broad general provisions of section 22 (a) of the Internal Revenue Code. In this matter, though the facts are different from those of H. S. Richardson, 42 B. T. A. 830; affd., 121 Fed. (2d) 1, the same principle applies as there expressed: Under the facts in the instant case we are not so much concerned with the refinements of title to the property which has been ostensibly passed around the immediate family circle as with the actual dominion and control over the property. Here, the property and the income therefrom is so clearly subject to the petitioner’s unfettered command that they are, in substance, his and, even though he did not see fit to use the property or the income during the taxable year, the latter may be taxed to petitioner as his income under the broad general tax provisions of section 22 (a) * * * The authority cited for the above quotation in the Richardson case included, among others, Helvering v. Clifford, 309 U. S. 331. The fact of family group there involved is present here, as is the dominion and control there considered. Here, as there, “legal paraphernalia which inventive genius may construct as a refuge from surtaxes should not obscure the basic issue.” See also Robert E. Werner, 7 T. C. 39; Anthony Cornero Stralla, 9 T. C. 801. Considering, as by the Clifford case required, all of the “circumstances attendant,” we hold that petitioner had in this case gross income from Golden Braid within the broad definition and view there taken. Even though the general theory of respondent is approved, we consider that he erred as to the years 1938, 1939, and 1940 in that he based the taxable amount for salaries disallowed on the figures in “the early audits of the income tax returns of Golden Braid,” while in a final audit letter under date of March 17, 1944, Josephine T. Drew was allowed an amount of $3,000 more a year for 1938,1939, and 1940 than shows in the early audit; in like manner the final audit letter shows salary allowed Mrs. B. M. Mason at $1,200 a year for these three years instead of $600 as shown in the early audit. We are of the opinion that, since respondent allowed these additional amounts as salaries in the final audit, such amounts, totaling $3,600 in each year, should be deducted from the amounts included in petitioner’s taxable income under salaries disallowed. (4) Respondent added $20,375 to petitioner’s 1940 income and. described it in the deficiency notice as “income from Key Publishing Company.” The question of whether this amount was income to petitioner in 1940 must be determined on the basis that respondent’s determination carries with it the presumption of correctness. This presumption, we do not think petitioner has overcome. There is convincing evidence that the Key Publishing Co. paid a dividend of $35 per share in October 1940. The amount of $20,375, representing part of the interest of 84 individual stockholders, was eventually received by (or paid to) petitioner. As to whether the amount was received by or paid to him in 1940 as loans, we have no evidence on which we can base a conclusion. The same is true of the circumstances attending receipt of the money. We merely know it was eventually received by him. Petitioner has not proved that the amount received constituted loans to him by the individual stockholders, as contended in his petition. The burden rests upon petitioner. In the absence of proof we must sustain the respondent on this item. (5) We come now to the question whether the deficiencies were due, in whole or part, to fraud with intent to evade tax, so that petitioner is liable for the 50 per cent penalty imposed by section 293 (b) of the Internal Revenue Code.[3] The burden is on the respondent. It must be shown that the petitioner meant to evade tax, and a conclusion that fraud was practiced by petitioner on members of the Mantle Club does not of itself satisfy that burden. To decide this issue, we are required to determine petitioner’s intentions concerning this matter during the taxable years from the evidence of record. The record shows, and we hold therefrom on the facts, that petitioner committed fraud on members of the Mantle Club. It shows the fraud to be continuing during all of the years here involved, and during the times when the returns were filed. It shows the large amounts of money received by the petitioner, and that they were not reported. It shows that petitioner was tax-conscious, in that he (through his employees) had conferences with tax officials; that he had tax cases in court; and that he employed péople to advise him on tax matters. At one point in his drive for “PL” funds he gave as an excuse for not organizing large corporations that small ones would pay less tax. One of the “PL” series was solicited on the basis that it would be used to pay petitioner’s income tax liability, as to which he claimed there would later be a refund. It is our opinion that the facts of this case present such a sequence of events that we must conclude that petitioner omitted from his income tax returns the amounts received from the “PLs” due to fraud with intent to evade tax and that a large part of the deficiencies is due to fraud with intent to evade tax.. In making this conclusion, we are conscious that, to find fraud, it must be proved by clear and convincing evidence. A. W. Mellon, 36 B. T. A. 977. We are of the opinion that such clear and convincing evidence is present in this case. (6) We having concluded that the deficiencies involved were in part due to fraud with intent to evade tax, and that the returns were fraudulent with intent to evade tax, it follows that none of the statutes of limitation relied upon by the petitioner apply. Sec. 276 (a), I. R. C. (7) The petitioner raises the question, as to 1938, as to the burden of proof where two deficiency notices were sent, but the respondent, by affirmative plea in his answer, raised the issues involved. Assuming that the respondent had the burden, we consider that the evidence before us sustains the holding that there was, under the facts so involved for 1938, income to the petitioner. The petition alleges error of the respondent in failing to determine overpayments of $715.28 and $1,930.51 for the years 1939 and 1940, respectively. Under our conclusion above, there was no overpayment. Also, there is no satisfactory proof from which we could find as fact that such payments were made. Reviewed by the Court. Decisions will be entered under Rule 50. Van Fossan, J., dissents. (b) Fraud. — If any part of any deficiency Is due to fraud with Intent to evade tax, then 50 per centum of the total amount of the deficiency (in addition to such deficiency) shall be so assessed, collected, and paid, in lieu of the 50 per centum addition to the tax provided in section 8612 (d) (2).