VINCENT W. ECKEL and NATALIE M. ECKEL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Eckel v. Commissioner
Docket Nos. 1716-68, 3378-69.
United States Tax Court
T.C. Memo 1974-33; 1974 Tax Ct. Memo LEXIS 287; 33 T.C.M. (CCH) 147; T.C.M. (RIA) 74033; February 4, 1974, Filed. Bruce I. Hochman, for the petitioners.
Robert H. Feldman, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT *288 AND OPINION
TANNENWALD, Judge: * Respondent determined deficiencies in the petitioners' Federal income taxes as follows: Docket no.
Taxable year
Deficiency 1716-68
1963
$13,037.85
1964
392.93
3378-69
1965
7,920.93 2 The issues presented for decision are: (1) Whether petitioner is taxable on royalties during a two-year period in which the royalties attributable to his 80-percent interest in a patent application were paid to another person owning the remaining 20-percent interest therein, in exchange for that person's 20-percent interest subsequent to the two-year period; (2) whether the sale by petitioner to his wholly owned corporation of his interest in a patent application was the sale of property of a character which is subject to the allowance for depreciation provided in section 167, [1] so that the royalty income derived therefrom is taxable to petitioner as ordinary income under section 1239; (3) whether *289 the expenses incurred by petitioner in taking an African safari are deductible by him as ordinary and necessary business expenses within the meaning of section 162.
FINDINGS OF FACT
Petitioners are husband and wife. Their legal residence when they filed their petition was Encino, 3 California. Petitioners filed joint Federal income tax returns for the years 1963, 1964, and 1965 with the district director of internal revenue, Los Angeles, California. Reference to "petitioner" herein is intended to designate Vincent W. Eckel.
Issues 1 and 2. Patent Application Issues In the early 1950's, petitioner borrowed $15,000 from his mother-in-law, Grace E. Miller (hereinafter referred to as Miller), in order to obtain capital to enable him to develop a particular type of solenoid valve which petitioner had invented. In addition to obligating himself to repay the loan (which was, in fact, repaid), petitioner gave Miller a 20-percent interest in the invention and any patents issued thereon.
A prototype of the valve was successfully reduced to production, and the first *290 orders were placed with petitioner in 1950 and 1951. Petitioner began operations as a proprietorship under the name of Eckel Valve Company.
On January 18, 1952, petitioner, as the inventor, filed a patent application with the United States Patent Office. 4 Eckel Valve Company, hereinafter sometimes referred to as the corporation, was incorporated in 1953, with petitioner at all pertinent times the sole stockholder. Petitioner became and remained president of the corporation. His wife became secretary-treasurer of the corporation. Petitioner and his wife have at all times maintained control of the corporation's policies and overall operations.
On May 27, 1957, the application for patent was resubmitted to the United States Patent Office and designated as a continuation in part of the earlier application.
On December 26, 1957, petitioners and Miller sold the invention, with patent application pending, to petitioner's wholly owned corporation. The pertinent portions of the agreement of sale are as follows:
2. The Sellers [both petitioners and Miller] [2] hereby sell and transfer to the Purchaser [the corporation] the exclusive world-wide right, and right to license *291 others, to make, use and sell any products made under the said pending patent, patent rights, or any United States or foreign patents issued in respect to said invention or any improvements thereof developed by the Sellers during the life of this patent or any improvements thereof. 5 3. In consideration therefor the Purchaser agrees to pay to the Sellers five per cent (5%) of the gross income received from the manufacture and/or sale of all sums received from any sublicensee of the Purchaser as follows:
20% to Grace E. Miller
80% to Vincent W. and Natalie M. Eckel
* * *
6. If at the end of any six (6) month period Purchaser shall report manufactures or sales of products under such patent rights which entitle the Sellers to less than $2,000.00, the Sellers shall have the right, upon giving 30 days notice in writing to the Purchaser, to cancel this contract and thereupon all rights hereunder at the end of said 30 day period, shall revert to the Sellers.
7. If at any time *292 hereafter it should be finally determined by the United States Patent Office, from which determination no appeal is or can be taken, or if any Court shall hold by a decision from which no appeal is or can be taken, that the process with respect to which Sellers have applied for a patent, and the rights under which have been granted to the Purchaser, is unpatentable, invalid or restricted in scope, then full force and effect shall be given to such determination in thereafter construing this agreement, and Purchaser shall be entitled to the full benefit thereof from and after the date of such determination.
* * *
10. Either party hereto shall have the right to terminate this contract if the other party is guilty of a substantial breach 6 hereof which breach is not corrected within sixty (60) days after written notice thereof sent by the injured party to the offending party.
In 1962, Miller was 62 years old and expected to undergo surgery at some time in the future. She had worked as a part-time employee for Eckel Valve Company for some years but felt that she would not be returning to work after the operation. Petitioner thought that, because of Miller's age and her questionable *293 health, she had a greater need for present income than for future income.
Both petitioners and Miller entered into an agreement, the pertinent provisions of which were as follows:
MEMORANDUM OF AGREEMENT
between
Grace E. Miller, and
Vincent W. and Natalie M. Eckel May 1, 1962
Whereas Miller holds a 20% interest, and Eckel holds an 80% interest in patent applications 267178 and 661837, concerning solenoid valve construction invented by Eckel.
That the respective interests of the above parties are set forth in an agreement dated 26 December 1957, formalizing an oral agreement of 23 July 1951. 7 That it is now the wish of the parties to modify that agreement in such way as to achieve the following terms, as an even exchange of values:
For a 2 year period, from April 1st 1962 thru March 31 1964, Miller will have 100% interest in all benefits arising from said invention, whether royalties, sub-licenses, or recoveries from infringers. And that As [sic ] of April 1 1964 and subsequent, Eckel shall have that same 100% interest, and that Miller shall have no further interest.
The following memorandum dated June 16, 1962 was written by petitioner to Miller:
Regarding our *294 agreement of May 1st 1962 by which you will receive my share of royalties for 2 years in even exchange for your share thereafter, the mutual advantage seen lies in the difference of our ages and our respective incomes at this time. However, we ought to record at this time, some substantion [sic ] of our feeling that this is an equal exchange.
Nothing is certain, but if we assume (a) that a patent is granted to our application, (b) that technological advances do not render the invention unsaleable, (c) and that demand continues in the future at about the same sales level as it has in the past, then your position will be as follows:
Under the original contract, you received 1% royalty, or about $6000 per year. At that rate, you would collect during the 17 year life of the patent, if issued, a total of…$102,000
Under the modified agreement, you receive 5% royalty, or about $30,000 per year, or $60,000 in the next 2 years, and nothing thereafter. Investing that sum at 5% interest would 8 yield $3000 per year, which during 17 years would amount to $51,000, making a total, counting principal and interest, of…$101,000.
Should the sales volume climb steeply in the next 2 years *295 and then drop off to nothing, you will be far ahead.
On the other hand, if sales slump now, and then zoom after 2 years, I will have had the better bargain.
But we have no way of foreseeing the future, and can see no reason to expect either event.
The memorandum was written at the suggestion of petitioners' tax counsel with the purpose of substantiating that the exchange was a fair trade.
All royalties which accrued during the term of the exchange agreement, April 1, 1962 through March 31, 1964, were paid to Miller directly. No royalties that had accrued to petitioner before the term of exchange agreement were paid to Miller, no royalties that accrued during the term of the exchange agreement were ever paid to petitioner, and no royalties which accrued after the term of the exchange agreement were ever paid to Miller. On their 1960, 1961, and 1962 returns, petitioners reported the royalties received by them as long-term capital 9 gain. At some undisclosed date, the Internal Revenue Service disputed this treatment and, as a result, petitioners reported such royalties as ordinary income commencing in 1965. [3]
*296 There was never any indication that any of petitioner's claims would be accepted by the Patent Office. On the contrary, the Patent Office consistently rejected the claim, citing conflicts with other patents.
All claims under the patent application were finally rejected by the Patent Examiner. An appeal was taken to the Appeal Board within the Patent Office, which affirmed the examiner's rejection. Petitioner then filed suit in the United States District Court to challenge the Patent Office Appeal Board's rejection. On October 5, 1964, the district court dismissed petitioner's complaint, holding that the application for patent was properly denied on the ground of lack of invention. That decision was affirmed on June 3, 1965 10 and a petition for writ of certiorari was denied on November 8, 1965. Eckel v. Ladd, 233 F. Supp. 879 (D. D.C. 1964), affirmed per curiam 350 F.2d 787 (C.A.D.C., 1965), certiorari denied 382 U.S. 907 (1965). No patent was ever issued on the application.
As of November 10, 1965, pursuant to the terms of the sale contract, the corporation ceased accruing royalties on sales of the invention. Between the expiration *297 of the exchange agreement with Miller on March 31, 1964 and November 10, 1965, $66,639.44 of royalties had accrued in petitioner's favor, as the recipient of 100 percent of the sale proceeds royalties, which were paid to him. He received no further payments from the corporation under the sale contract.
In his notices of deficiency, respondent determined that petitioner's gross income should be increased for the taxable years 1963, 1964, and 1965 by 80 percent of the amounts paid to Miller in accordance with the May 1, 1962 agreement. By an amended petition, petitioner claims that any such amounts, if found to be taxable to him, as well as any royalties from 11 the corporation previously reported by him as ordinary income, should be accorded capital gain treatment.
Issue 3. Safari Expense Issue Petitioner and his wife were both interested in the sport of hunting as a pastime.
In 1956, petitioner began a sporting goods business which consisted almost exclusively of the sale of firearms and related equipment. This activity was initially begun as a part-time business in petitioner's residence, which was then in Northridge, California. As the valve business began to demand *298 less of petitioner's time, he considered further developing his interests in firearms. In 1958, petitioner purchased a ranch in San Luis Obispo, California, and moved there, taking his firearms business with him.
While at the ranch, part of each day was spent in the business of the valve company. Petitioner and his wife also spent about one or two days per month at the valve company location itself. The rest of the time he devoted to his firearms activity, either talking to customers, "tuning" rifles, or selling rifles and giving instructions. 12 After moving to the ranch, petitioner built fairly extensive physical facilities for his gun business, including workshops, a display room, and sight testing ranges, and entered exhibits in sportsmen's shows in an attempt to attract the interest of local hunters. He developed a particular interest in the Weatherby rifle and directed a good deal of his attention toward mastering the capabilities and use of this particular brand of rifle.
In 1963, petitioner designed and built a laboratory with chronographs to measure the speed of bullets and better facilities for servicing the rifles, for attaching the telescopes, and for maintaining *299 an inventory of reloading equipment for sales to customers. Petitioner was particularly interested in telescopic and ballistics research and development.
Petitioner tried to develop his gun business as a specialty enterprise rather than as an ordinary over-the-counter retail establishment. He claimed to have the largest stock of Weatherby rifles anywhere in the world outside the Weatherby factory. He "tuned and scoped" the guns that were on display 13 rather than just having them stocked in boxes or on a rack right out of the box and attempted to "fit" his customers to, and to teach them how to use, weapons particularly appropriate to their respective needs. Petitioner felt that these added services would cause a person to purchase a gun from him as opposed to another dealer.
All of these services were incident to the sale of equipment and were not conducted as a separate fee-generating activity.
Petitioner's retail gun business was not financially successful, as indicated by the following schedule: 1960
1961
1962 Gross receipts
$6,137.77
$6,977.78
$6,196.97
Cost of goods sold
5,445.69
6,000.89
5,200.45
Gross profit
$ 692.08
$ 976.89
$ 996.52
Expenses
8,846.13 *
2,883.83
1,815.17
Net income (loss)
($8,154.05)
($1,906.94)
$ 818.65)
1963
1964
1965
Gross receipts
$11,521.70
$3,056.81
$1,427.91
Cost of goods sold
4,316.78
1,406.90
1,351.80
Gross profit
$ 7,204.92
$1,649.91
$ 76.11
Expenses
8,268.20**
1,378.40
1,330.98
Net income (loss)
($ 1,063.28)
$ 271.51
($1,254.87)
1966
1967
Gross receipts
$1,278.55
$2,174.50
Cost of goods sold
1,237.09
1,046.25
Gross profit
$ 41.46
$1,128.25
Expenses
636.65
588.85
Net income (loss)
($ 595.19)
$ 539.40
*300 14 Petitioner decided that he was subsidizing his fellow sportsmen in that they were not paying for the additional services that he was providing when he sold the weapons. He began to think that such extensive instructional attention should be limited to people of means who would spend large sums of money on safari to Alaska or Africa, and not the local hunter. He felt that his efforts might prove more fruitful if he would shift his activities to safari-training.
He decided to take an African safari, believing that this experience would make more effective his decision to shift his activities from selling to all types of hunters and gratuitously training them to the specialized outfitting and training of the large-scale foreign hunter for a fee. Petitioner had done extensive reading on the entire subject of big game hunting and had done significant amounts of technical research, but he had no field experience in Africa.
Petitioner took his first safari to Mozambique, Portuguese East Africa, in 1960. The safari lasted 15 about six weeks, Accompanying the petitioner were his wife, *301 their then 16-year-old daughter, and an "old hunting friend."
Petitioner recorded in a log book the technical aspects of the safari. He noted such incidents as the behavior of the particular animals, the distances from which one was shot, the type of bullet used, and the effect of the bullet's contact with the animal. Animals were dissected and bullets were kept and tagged for future reference. This detailed on-the-scene research was quite unique and is not the type of activity performed on a safari for pleasure.
Petitioner's wife went along as company for petitioner and for her personal enjoyment. She was an accomplished hunter in her own right. The daughter went along because petitioner believed that his children should have the experiences that are born of traveling. Admittedly, the wife's, the "old friend's," and the daughter's presence were nonbusiness oriented.
On his 1960 Federal income tax return, petitioner deducted $5,601.45 of the expenses as the amount allocated to himself and as being business-related. The 16 respondent disallowed the deduction.
Upon his return, petitioner determined to eliminate from his inventory most ordinary domestic rifles and to specialize *302 in high quality, expensive weapons such as the Weatherby rifle and possibly some foreign weapons such as English elephant rifles which would appeal to a wealthy clientele.
As petitioner had decided to make the Weatherby rifle a central part of his new concept, he contacted the Weatherby Company.When he broached the subject of a training school, Weatherby was enthusiastic. The only tangible result of this was that he was offered a distributorship of the Weatherby rifle; however, he responded that he would not take advantage of it because his only source of income was his valve company.
After the 1960 safari, petitioner became interested in certain organizations of big game hunters and attended meetings of and associated with members of the Shikar Safari International. In addition, he continued to ponder the possibility of developing his gun ranch into a safari 17 training ground.
Petitioner knew several travel agents who booked African hunts and he considered them sources to make known to those outside the safari clubs the services which petitioner could make available, but he did not make any attempt to exploit these contacts as that time.
Around 1961, petitioner booked for *303 a second safari - a 30-day expedition scheduled for late in 1963 - this time to Angola in Portuguese West Africa. It was necessary that such bookings be made approximately two years in advance. He paid a substantial deposit which was forfeitable if the trip was not taken.
Around 1962, petitioner first realized that his and his wife's absence from the operations of the corporation was not working out well. He had hoped that the valve business would take less and less time, but he found this was not the case and he became increasingly dissatisfied with the management of the valve company. He and his wife began to increase the frequency of their visits to the corporation's offices attempting to improve the business. Unfortunately, this arrangement also did not prove successful. 18 Petitioner and his wife found it necessary to return to the valve business on a full-time basis following a substantial turnover of personnel. In May 1963, they left the ranch and moved back to Encino, intending only to stay away for about a year. However, at the time of the trial,they had not moved back to the ranch.
As the time for the second scheduled safari approached, there was still a substantial *304 degree of uncertainty with respect to the operations of the corporation. Nevertheless, in November and December 1963, petitioner and his wife went on the second safari, this time to Angola, Portuguese West Africa. Petitioner thought it better not to forfeit the previously made deposit by staying home and running the valve business.
This safari was on the other side of the African continent and in a different season from that of the first safari. Petitioner wanted to see what hunting was like in a different terrain, in a different season, hunting different kinds of animals. 19 While in Africa, petitioner met and talked with an experienced booking agent about the potential in the safari booking business, although petitioner had no desire to go into the business with the agent. He also met a variety of other people (government personnel, guides, and safari outfitters) and discussed a wide variety of topics, including the possibility of establishing training facilities in Africa itself.
There was no descriptive journal or log kept on this safari as was done on the 1960 safari.
The total cost of the 1963 safari trip was $11,727.66. Petitioner allocated approximately one-half *305 of this amount to himself and deducted $5,863.84 on his 1963 Federal income tax return.
Petitioner's wife's presence on this safari was personal in nature and no deduction was claimed for the half of the expenses allocated to her. However, she did feel that, as an experienced hunter who was taught by petitioner, she was a good "advertisement" for his business efforts and that this was one reason she accompanied him in addition 20 to the fact that she personally enjoyed hunting.
After returning from the 1963 safari, petitioner continued his interests in firearms and hunting activities. However, he did not return to live at the gun ranch but remained in Encino. The tenant that he had put on the gun ranch when he left in May of 1963 still maintained the ranch and remained there until the summer of 1964.
Following the termination of the tenancy, petitioner took the remaining firearms and placed them out with other dealers. Since that time, there have been a few sales pursuant to special order. There has been no advertising since the petitioner left the ranch in 1963. There has been no attempt to maintain any stock-in-trade. There has been no development of the physical facilities *306 at the ranch for training purposes.
After the first safari, petitioner gave only one one-hour lesson for a $60 fee - to an experienced hunter on the subject of gun safety. No instructional fees have been generated since the second safari. 21 Petitioner joined Shikar Safari International after the second safari, which made him eligible to join. He also became a member of the Southern California Safari Club.
In 1968, five years after the second safari, petitioner had correspondence with Winchester World-Wide Safaris and Colt Industries, Inc., relative to developing his gun ranch into a safari training ground, apparently with the idea of putting together a package deal with these companies by using his ranch as a training ground for safaris promoted by these companies. There were no subsequent developments of these plans beyond these initial suggestions.
Drawing on his experiences in Africa and also from his extensive technical knowledge of firearms, petitioner published some articles in safari-oriented journals. [4] He also continued to do research on telescopic range-finding equipment needed by a big game hunter, as opposed to other uses. In 1969, he performed a detailed testing *307 examination of a Weatherby rifle belonging to C. J. McEllroy, winner of the Weatherby award for the most outstanding hunter of 1969. 22 OPINION
Issue 1. To Whom Is the Royalty Income Taxable Initially, petitioners were to receive 80 percent and Miller 20 percent of the royalties and other financial benefits payable by the corporation in respect of petitioner's invention. The corporation was not required to make any such payments from and after the date of a final determination that the invention was "unpatentable, invalid or restricted in scope."
That eventuality occurred in November 1965. By virtue of the May 1, 1962 agreement, Miller was to receive 100 percent of such payments accruing during the period April 1, 1962 through March 31, 1964 and petitioners were to receive 100 percent of such payments thereafter. The agreement was implemented and royalties accruing during the two-year period were paid to Miller, all royalties accruing thereafter being paid to petitioner.
Respondent asserts that 80 percent of the royalties paid to Miller in accordance with the May 1, 1962 agreement are *308 taxable to petitioners under the "assignment of income" doctrine. Petitioners, on the 23 other hand, contend that they made a valid transfer to Miller of their right to share in the royalties during the two-year period and that accordingly none of the amounts paid to Miller should be treated as their income.
We find it unnecessary to wend our way through the briarpatch of the decided cases dealing with the "assignment of income" doctrine and often reflecting the application of concepts bordering on the metaphysical. See, Eustice, "Contract Rights, Capital Gain, and Assignment of Income - The Ferrer Case," 20 Tax L. Rev. 1 (1964); Lyon and Eustice, "Assignment of Income: Fruit and Tree as Irrigated by the P. G. Lake Case," 17 Tax L. Rev. 293 (1962). Rather, we dispose of this issue on the totality of the factual circumstances reflected in the record herein. On this basis, we hold that respondent should prevail. Our decision rests on several critical elements, although we do not mean to imply that these are the only elements which have influenced us.
In the first place, petitioners did not part with their entire interest in the royalty contract; *309 they merely transferred to Miller a carved-out two-year portion, retaining for 24 themselves the balance of their original interest. This aspect of the case more closely fits Harrison v. Schaffner, 312 U.S. 579 (1941), than Blair v. Commissioner, 300 U.S. 5 (1937). Compare Montgomery v. Commissioner, 230 F.2d 472 (C.A. 5, 1956), and Gladys Cheesman Evans, 30 T.C. 798 (1958), with Galt v. Commissioner, 216 F.2d 41 (C.A. 7, 1954), affirming 19 T.C. 892 (1953). Compare also Commissioner v. P. G. Lake, Inc., 356 U.S. 260 (1958). It also distinguishes this case from Commissioner v. Reece, 233 F.2d 30 (C.A. 1, 1956), affirming 24 T.C. 187 (1955), heavily relied upon by petitioners, where the taxpayer transferred his entire interest in a royalty contract. Compare Heim v. Fitzpatrick, 262 F.2d 887 (C.A. 2, 1959).
In the second place, petitioner and his wife remained in substantial control of the situation. As the president and sole shareholder of the corporation, petitioner could determine the extent to which the patent application should be prosecuted *310 and the production of the solenoid valve upon which the payment of royalties 25 depended. Cf. Robert E. Werner, 7 T.C. 39 (1946). In this connection, we note that the corporation's obligation to pay royalties ceased upon the final rejection of the patent application. Moreover, petitioner's position vis-a-vis the corporation and his and his wife's dominant interest in the royalty payments gave them a degree of control over the royalty contract which, although it does not fit the exact factual situation involved in Commissioner v. Sunnen, 333 U.S. 591 (1948), sufficiently approaches that situation to make the principles articulated in the Supreme Court opinion particularly apt. Cf. Estate of J. G. Dodson, 1 T.C. 416 (1943). In this context, Miller's apparent willingness to leave all arrangements to the petitioner, as revealed by her testimony, has a particular significance. Cf. May T. Hrobon, 41 T.C. 476, 496 (1964). The control feature further distinguishes Commissioner v. Reece, supra, where the payor of the royalties was an independent third party.
Additionally, we note the tax flavor with which the *311 transaction was impregnated. The June 16, 1962 memorandum was written on the advice of tax counsel and it is not unreasonable to infer from the evidence that 26 the transfer in question took place at or about the time of the dispute relating to the respondent's characterization of the payments from the coporation as ordinary income rather than long-term capital gain. While we realize that tax avoidance motives do not necessarily prevent a transfer such as that involved herein from being recognized, the presence of such a motive clearly can be considered in determining whether the substance of a transaction coincides with its purported form. See Irvine K. Furman, 45 T.C. 360, 364 (1966), affd. 381 F.2d 22 (C.A. 5, 1967).
Finally, we do not think that the fact that Miller transferred her 20 percent interest from and after the expiration of the two-year period saves the day for petitioners. The value of such purported consideration was, not only not certain, but, in fact, speculative at best, given the apparently parlous state of the patent application.[5] *312 Cf. May T. Hrobon, supra.Compare also 27 Greer v. United States, 480 F.2d 631 (C.A. 6, 1969); Commissioner v. Ferrer, 304 F.2d 125, 133 (C.A. 2, 1962). Moreover, such consideration was both contingent and in futuro, which serves to distinguish such cases as Estate of Stranahan v. Commissioner, 472 F.2d 867 (C.A. 6, 1973), reversing a Memorandum Opinion of this Court, and Cotlow v. Commissioner, 228 F.2d 186 (C.A. 2, 1955), although this factor, if standing alone, would not necessarily be determinative.
In sum, upon the basis of the record as a whole and recognizing that transactions of the type involved herein require close scrutiny (see Commissioner v. Sunnen, supra, 333 U.S. at 605), we conclude that the exchange of interests, purportedly effected by the May 1, 1962 agreement, should not be recognized. Accordingly, *313 we hold that 80 percent of the royalties accrued in favor of Miller during the two-year period April 1, 1962 through March 31, 1964 constitute income of the petitioners.
Issue 2. Transfer of Patent Application The royalties paid by the corporation were in consideration of the sale to it of a patent application and the invention covered thereby by petitioners and 28 Miller. The parties are in agreement that the payments are entitled to long-term capital gain treatment unless the provisions of section 1239 apply, in which case they would be taxed as ordinary income. [6] The resolution of this issue turns upon whether the patent application "is property of a character which is subject to the allowance for depreciation provided in section 167" within the meaning of section 1239(b).
*314 The precise question presented has previously been considered by this Court. Lan Jen Chu, 58 T.C. 598 (1972), affd. F.2d (C.A. 1, Nov. 2, 1973); Estate of William F. Stahl, 52 T.C. 591 (1969), affirmed in part and reversed in part 442 F.2d 324 (C.A. 7, 1971); Benjamin I. Davis, T.C. Memo. 1972-235, on appeal (C.A. 6, Apr. 6, 1973). In those cases, 29 we held that patent applications are not depreciable property for the purposes of section 1239 and, as to such applications with respect to which there was no indication of allowability of a patent prior to the sale (the factual situation herein), we were affirmed by the Fifth and Seventh Circuit Courts of Appeal. We have considered and reject respondent's suggestion, and the authorities cited in support thereof, that we retreat from the position we have taken on this issue, including respondent's attempt to have us treat the instant situation differently because the sales price was contingent (see Lan Jen Chu, supra ).
Accordingly, we hold that the gain from the *315 sale of the rights to the patent application by petitioners to the corporation is reportable as long-term capital gain by petitioners. 30 Issue 3. Safari Expense The issue is factual and involves a determination whether the safari expenses incurred by petitioner in 1963 were "ordinary and necessary expenses paid or incurred * * * in carrying on any trade or business" so as to be deductible under section 162(a).
We find it hard to see a sufficient correlation between the broad range of activities experienced on the safari and the business of selling guns at retail in California. The fact that petitioner had gratuitously instructed purchasers in the proper techniques of firing such weapons does not provide the nexus essential to a determination that petitioner's expenditures were "ordinary and necessary" within the meaning of the statute, particularly when the personal overtones stemming from his wife's presence on the trip are taken into account. Petitioner's situation is a far cry from that involved in Sanitary Farms Dairy, Inc. 25 T.C. 463 (1955). [7] But, even if such nexus could be found to exist under normal circumstances, the fact is that by mid-1963, *316 petitioner's retain gun business 31 had become dormant. It appears that, at best, petitioner was simply preparing himself to reenter the retail gun business at some indefinite future time. The nexus thus supplied would still be insufficient. See C. Fink Fischer, 50 T.C. 164, 172 (1968).
Petitioner has also attempted to show that he was engaged in the trade or business of instructing persons in the techniques of big game hunting at the time of the 1963 safari. We see no purpose to be served in reiterating the details of petitioner's activities in this regard, which are set forth in our findings of fact. The record herein discloses that, at most, petitioner was investigating the possibilities of developing a safari-training business and preparing himself to enter that business at some future point of time. The decided cases are clear that expenditures for such a purpose do not satisfy the requirements of section 162(a). Hyman Myers, 38 T.C. 658, 666 (1962); Frank B. Polachek, 22 T.C. 858 (1954); Morton Frank, 20 T.C. 511 (1953); *317 George C. Westervelt, 8 T.C. 1248 (1947). See also Edwin A. Snow, 58 T.C. 585 (1972), affd. 32 482 F.2d 1029 (C.A. 6, 1973). [8]
Accordingly, we sustain respondent's disallowance of the deduction for safari expenses for 1963.
Decisions will be entered under Rule 155. Footnotes
*. Pursuant to a notice of reassignment sent to counsel for the parties, and to which no objections were filed, this case was reassigned by the Chief Judge on December 13, 1973 from Judge Austin Hoyt to Judge Theodore Tannenwald, Jr.↩
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
2. The record contains no explanation as to why Natalie M. Eckel was a party to this agreement or to the subsequent May 1, 1962 agreement but not the June 16, 1962 memorandum referred to hereinafter. ↩
3. Petitioners received no actual payments of such royalties in 1963 and 1964 and hence disclosed none in their return for those year.↩
*. Including Safari expenses of $5,601.45.
** Including Safari expenses of $5,863.84. ↩
4. There is no evidence that petitioner was compensated for these activities. ↩
5. The record is unclear as to the dates upon which unfavorable action was taken by the United States Patent Office, but, to the extent that such information might have been favorable, petitioners, who have the burden of proof, must suffer the consequences of such lack of clarity.↩
6. Respondent makes no argument that, since section 1235 does not apply because petitioner and the corporation were related persons (see section 1235(d)), petitioners are not entitled to capital gain treatment. See Lan Jen Chu, 58 T.C. 598 (1972), n. 1; Benjamin I. Davis, T.C. Memo. 1972-235, n. 2. Nor does respondent argue that the 1957 sale was a closed transaction so as to preclude the treatment of royalties as the proceeds of a sale or exchange. Compare Donald C. MacDonald, 55 T.C. 840↩ (1971).
7. Compare also Robert C. Hoffman, T.C. Memo. 1960-160, affd. 298 F.2d 784↩ (C.A. 3, 1962).
8. See and compare Martin C. McGowan, T.C. Memo. 1964-241, affd. 347 F.2d 728 (C.A. 7, 1965), with Dana W. Brown, T.C. Memo. 1970-253, affd. 446 F.2d 926↩ (C.A. 8, 1971).