Robert C. Hoffman v. Commissioner.
Hoffman v. Commissioner
Docket No. 64405.
United States Tax Court
T.C. Memo 1960-160; 1960 Tax Ct. Memo LEXIS 129; 19 T.C.M. (CCH) 836; T.C.M. (RIA) 60160; July 29, 1960
*129 1. Respondent's determination of additional unreported taxable income by the cash expenditures method approved except as to individual items which the petitioner proved to be erroneous. 2. The petitioner maintained books and records for business activities on an accrual method of accounting and records as to nonbusiness activities, including rental of property, on the cash receipts and disbursements method. Held: That his rental income may be reported in his return on the cash method although his business income is reported on an accrual method. 3. In connection with his business of manufacturing weight lifting and other athletic equipment and in connection with the publishing of a health magazine, the petitioner paid traveling expenses for himself, certain of his employees and certain athletes to attend Olympic Games and other competitions held abroad. Held: That these expenditures were made primarily to further the petitioner's businesses and constituted ordinary and necessary business expenses. 4. Held: That the statute of limitations is not in issue when not pleaded and where mentioned for the first time on brief. Given v. Commissioner, 238 F. 2d 579. Elmer M. Morris, Esq., 32 *130 North Duke Street, York, Pa., and Arthur Markowitz, Esq., for the petitioner. Stephen P. Cadden, Esq., for the respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined deficiencies in income tax and additions thereto for the years and in the amounts as follows: I.R.C. 1939
Sec.
Sec. 294
Year
Income Tax
293(b)
(d)(2)
1948
$109,100.56
$54,550.28
$6,486.42
1949
40,178.00
20,089.00
2,500.62
1950
26,779.72
13,389.86
1,494.75
The respondent on brief has conceded that the petitioner is not liable for additions to tax under section 293(b) of the Internal Revenue Code of 1939. The remaining issues are whether the respondent properly computed taxable income under the cash expenditures method; whether he erroneously increased rental income; whether he improperly disallowed deductions for certain claimed travelling expenses; and whether petitioner is liable for additions to tax for substantial underestimation of estimated tax.Other issues were settled by stipulations at the trial, and will be referred to hereinafter. Findings of Fact Some of the facts are stipulated and are found as stipulated, the stipulation being incorporated herein by this reference. The petitioner *131 resides in York, Pennsylvania. He filed timely income tax returns and declarations of estimated tax for the years 1948, 1949, and 1950 with the collector of internal revenue for the first district of Pennsylvania. Petitioner also filed individual income tax returns for the years 1929 through 1947 reporting total net income of $384,748.88 on which he paid income taxes and interest totaling $94,911.01 (plus some undisclosed amount for 1933), and in which depreciation deductions were taken in the total amount of $36,371.42. During the years in question, 1948, 1949, and 1950, petitioner was engaged in several businesses. He owned as sole proprietor the York Barbell Company which manufactured and sold numerous types of weight lifting and body building equipment throughout the United States and in many foreign countries; Strength and Health Publishing Company which published and sold monthly the "Strength and Health" magazine (subscription $2.50 per year) and sold books written by the petitioner on health, body building, weight lifting and related subjects; York Barbell Foundry which manufactured castings for barbells and did austom work for others; and the York Light House Company, which *132 sold light fixtures. Petitioner was editor of the Health and Strength magazine and also authorized many articles published therein. This magazine served also as the advertising medium for products sold under the name of the petitioner's various enterprises. There are also advertised therein under the name of the petitioner several products such as sun tan lotion, "Bob Hoffman's Rub," pamphlets or publications on weight lifting, and barbell training sets. There are also advertised numerous muscle building and other athletic products under the name of York Athletic Supply Company. Therein York Barbells and other products are advertised as being manufactured in Tulare, California, and Scarborough Bluffs, Ontario, Canada. The petitioner was also a stockholder in the york Precision Company, a corporation which manufactured, among other things, CO2 appliances. Since 1936 Michael Dietz, who is not an accountant but who had taken a course in bookkeeping, has kept separate books and records for each of the three businesses - York Barbell Company, Strength and Health Publishing Company, and York Barbell Foundry. These books were kept on an accrual method. Dietz also kept a separate record of *133 transactions of the petitioner, aside from the business activities conducted under the names of York Barbell and Strength and Health Publishing Company. These separate records were kept on the cash receipts and disbursements method of accounting. The petitioner seldom went over the results of transactions with Dietz, and generally did not give him any instructions or directions as to how to handle any specific transaction or transactions on the books. Dietz took care of the purchasing as well as the bookkeeping in petitioner's businesses, but had very little to do with sales Receipts of the businesses were received by check, money order, or cash. Cash receipts of the businesses were not handled by Dietz upon original receipt. When money orders were received Dietz would record these on tape rather than in a record book. The money orders were taken to the post office and cashed and then deposited in a business bank account. Duplicate deposit slips were made, one going to the bank and one being retained. The petitioner drew money from these businesses. These withdrawals were made by checks prepared by Dietz and signed by the petitioner. Dietz would generally cash them although at times *134 the petitioner would have them cashed elsewhere. The petitioner maintained a personal bank account in the Western National Bank in which was deposited nonbusiness income. At times business income was deposited in this account when the balance became low. For each of the years 1948, 1949, and 1950 the petitioner's income tax return was prepared by a firm of certified public accountants located in York. The returns for 1948 and 1950 indicate that they were prepared by the accounting firm from figures furnished them without verification. The return for 1949 indicates that it was prepared from the books without complete audit. The information furnished the accounting firm was furnished by Dietz. None of the information so supplied by Dietz was furnished by the petitioner. Although the returns purport to show operations of Strength and Health Publishing Company only, the figures contained therein are composite figures compiled by the bookkeeper from all the records which are kept. In his return for the year 1948, filed March 15, 1949, the petitioner reported gross profit from business of $121,558.92 and net profit of $16,003.60; rental income of $4,380; net income of $22,894.06; and tax *135 liability of $7,006.51. In his return for 1949, filed March 15, 1950, the petitioner reported gross profit from business of $122,331.76 and net profit of $20,237.17; rental income of $5,580; net income of $25,817.17; and tax liability of $8,505.55. In his return for 1950, filed March 15, 1951, the petitioner reported gross profit from business of $115,060.22 and net profit of $17,172.01; rental income of $5,100; net income of $22,272.01; and tax liability of $6,933.06. The respondent, in the notice of deficiency, stated that his determination was based on an examination of available books and records. Therein he disallowed certain claimed deductions, determined that the petitioner had unreported rental income, and also determined that he had additional unreported income for each of the years. He determined that the correct net income was as follows: $172,095.25 for 1948; $88,399.99 for 1949; and $64,118.71 for 1950. In determining the unreported income the respondent employed the "cash expenditures" method and added bank deposits for the years 1948 and 1949 which he determined had not been reported as income. The amounts of unreported income thus determined were as follows: $134,021.85 *136 for 1948, $36,667.20 for 1949, and $23,095.50 for 1950. In applying the cash expenditures method the respondent determined the amount of cash expeditures, set forth the ascertained sources of available funds, and determined that the difference constituted unreported income. His computation includes sources of available funds as follows: 1948
Drawings - Strength & Health Co.
$26,062.69
less - Payments to third parties
Income taxes paid
1-15-48
$ 3,937.97
3-15-48
2,431.06
9-15-48
1,833.33
Peoples Laundry
311.40
Miscellaneous
98.93
Rosetta Morris
100.00
Checks cancelled
4,650.00
13,362.69
Net drawings available
$12,700.00
Rental Income - Gross
4,380.00
Interest received per return
2,510.46
Total
$19,590.46
1949
Drawings - Strength & Health Co
$14,676.23
less - Payments to third parties
Income taxes paid
1-17-49
$ 1,833.33
3-15-49
1,503.25
6-7-49
1,503.27
9-14-49
1,503.25
Peoples Laundry
288.85
John Dauber
195.65
George Deardorff
400.00
Miscellaneous
98.63
7,326.23
$ 7,350.00
Add - checks of prior year previously
cancelled - added to check
dated 2-24-49
4,650.00
$12,000.00
Rental Income - Gross
5,580.00
Proceeds from sale of prop-
erty located at 316 E.
Market St., Marietta,
Penna., Consideration
$18,000.00
less - mortgage assumed
15,500.00
2,500.00
$20,080.00
1950
Drawings - Strength & Health Co.
$18,324.22
less - Payments to third parties
Income taxes paid
1-14-50
$ 1,503.25
3-15-50
3,625.43
4-5-50
344.41
6-15-50
2,126.00
9-15-50
2,127.00
Peoples Laundry
378.92
Miscellaneous
369.21
10,474.22
Net drawings available
$ 7,850.00
Rental Income - Gross
5,100.00
Total
$12,950.00
*137 The following tabulation shows the cash disbursements of funds determined by the respondent and his calculation of the total additional unreported income. Disbursements:
1948
1949
1950
Investments in York Light House Co.
$ 23,000.00
Purchase - 328 S. Duke St.
13,190.00
(Consideration $19,200 less check on personal
account $6,010)
Purchase - 310 Smyser St.
3,500.00
(Consideration $8,500 less mortgage of $5,000
to George W. Deardorff)
Payments to Rosetta Morris (ex-wife)
[1] 5,100.00 $ 5,200.00
$ 5,200.0
Investments in York Precision Co.
20,000.00
Loans to York Precision Co.
52,100.00
Mortgage payments to First National Bank -
Principal only
1,250.00
1,000.00
750.00
Mortgage payments to George W. Deardorff
200.00
[2] 4,400.00 Cash living expenses
20,000.00
20,000.00
20,000.00
Purchase Suntan formula
2,000.00
Stock purchase from J. L. See (York Precision
Co.) Sept.
20,000.00
Payment of Invoice of Cosmos Travel Bureau.
No payment on books, but credited on invoice
3,500.00
Loan on Mortgage to George L. Denues
1,800.00
Purchase - 1950 Chevrolet
395.50
(Total cost $1,894 less check of Strength &
Health Co. $1,498.50)
Total Disbursements
$138,340.00
$48,200.00
$36,045.50
Less: Available Funds
19,590.46
20,080.00
12,950.00
Total
$118,749.54
$28,120.00
$23,095.50
Add: Deposits to petitioner's personal account
not reported
15,272.31
8,547.20
Total Additional Unreported Income
$134,021.85
$36,667.20
$23,095.50
*138 Each of the items included in the respondent's determination will be taken up separately, where evidence was presented with respect thereto. Drawings It has been stipulated that the petitioner drew funds from Strength and Health Publishing Company in each year in the amounts determined by the respondent. Payments to Rosetta Morris Rosetta Morris is the former wife of petitioner, having been divorced from him in 1945. At the time of the divorce, the petitioner entered into a settlement agreement pursuant to which he paid her a settlement of $30,000. During the years 1938 to 1941, she was a salaried employee in petitioner's business, receiving a salary of $5,200 from Strength and Health Publishing Company which was reported on her returns. In the years in question, Rosetta Morris was not employed in any of petitioner's businesses. In 1948 and 1950 she received payments by check of Strength and Health Publishing Company in the amounts of $100 and $200, respectively, the latter payment being included in the respondent's computation in the item "Miscellaneous $369.21". These *139 were the only payments which she received from the petitioner or any of his businesses in the years in question. Investments in and Loans to York Precision Company It has been stipulated that the petitioner loaned or invested in the York Precision Company the following amounts: 1948
$27,800.00 (Loan)
1949
10,000.00 (Investment)
1950
14,120.00 (Loan) Mortgage Payments to George W. Deardorff On April 6, 1950, the petitioner drew a check for $2,055 on the Strength and Health Publishing Company bank account in favor of George W. Deardorff, in payment of principal of $2,000 on a mortgage due to Deardorff, and in payment of $55 interest The $55 was recorded on the books of the petitioner's business, but the $2,000 was not. The petitioner did not pay Deardorff $2,000 in cash in 1950. J. L. See Transaction On August 10, 1949, the petitioner entered into a contract with Jacques L. See which provided that See would transfer to the petitioner 21 shares of stock of York Precision Company, would transfer all his patents, franchises, developments, ideas, and manufacturing and sales rights which had been disclosed to the petitioner or to York Precision Company during See's employment and association *140 with petitioner and the corporation, and would not engage directly or indirectly in the manufacture of certain products manufactured by York Precision or in any business of the manufacture or sale of carbon dioxide dispensers for a period of 10 years. The petitioner therein agreed to pay See $3,000 in cash and to release and discharge all indebtedness owed by See to the petitioner and to the corporation. On August 10, 1949, the petitioner borrowed $3,000 from the York National Bank and Trust Company and executed 6 notes in favor of the bank. The funds obtained by the petitioner from the bank were paid to See. The petitioner repaid the loan to the bank in installments of $500 each on November 7, 1949, December 8, 1949, January 10, 1950, February 6, 1950, March 8, 1950, and April 10, 1950. The petitioner did not pay See an amount of $20,000 in cash in 1949 as determined by the respondent. He paid See $3,000 in cash from borrowed funds. He made expenditures of $1,000 in 1949 and $2,000 in 1950 in repayment of the bank loan. Cash Living Expenses During the years in question the petitioner was unmarried and lived frugally. He lived in a modest four-room frame bungalow with modest furnishings *141 and no telephone. He employed no help or servants in his home. He seldom purchased new clothes and such clothes as he purchased were inexpensive. As a health practice, he ate only once a day. He did not smoke and very seldom drank. His only entertainment consisted of going to the movies occasionally and attending a dance once a week at a small club in York, Pennsylvania. The petitioner traveled extensively in connection with weight lifting meets, body building contests and other athletic events and sales trips. He was away from York on trips in 1948 approximately 111 days, in 1949 approximately 73 days, and in 1950 approximately 89 days. The petitioner's cash living expenses amounted to $5,000 in each of the years 1948, 1949, and 1950. Invoice of Cosmos Travel Bureau In 1950 John Valentine of Leeds, England, was indebted to the petitioner's business in the amount of approximately $4,000 for merchandise furnished to him over a number of years. However, this amount had not been paid due to the fact that English monetary restrictions prohibited the payment of dollars outside of England. In 1950, at the petitioner's request, Valentine paid pounds sterling equivalent to $3,500 to one of *142 the airlines in London as a credit to the petitioner and this credit was used in part payment for transportation of the United States weight lifting team to Paris in 1950. Cosmos Travel Bureau, Inc., of New York handled the arrangements for transportation, and this credit appears on a statement furnished by Cosmos Travel Bureau to York Barbell Company. The sales of merchandise to Valentine had not been taken into account by the petitioner for tax purposes in the years of sale. Nor was the $3,500 or any part thereof included in income in 1950. The petitioner did not claim the $3,500 paid for transportation as a business expense for 1950. Deposits in Petitioner's Personal Account It has been stipulated that the amounts deposited in the petitioner's personal account in the years 1948 and 1949 were $14,850.42 and $8,547.20, respectively. The deposits in petitioner's personal account in 1948 consisted of rental income of $4,380 which had been included in the petitioner's income tax return for that year, and income from sales in the amount of $10,470.42 which was reported as sales income on petitioner's return. The deposits in petitioner's personal account in 1949 consisted of rental income *143 of $5,580 which had been included in his income tax return for that year and sales in the amount of $2,967.20 which had also been reported in the return as sales income. In his return for 1950 the petitioner included gross rental income of $5,100. Rental due from York Precision Company In each of the years 1948, 1949, and 1950 there was due and owing to the petitioner from York Precision Company an amount of $3,600, representing rental on a building which petitioner had leased to that company. During these years this rent was not paid by the York Precision Company to petitioner, although it was accrued on the York Precision Company books. During the years in question the petitioner deducted expenses relative to the property. Automobile Depreciation - 1948, 1949, 1950 In each of the years 1948, 1949, and 1950, the petitioner claimed depreciation in the amount of $763.21 on an automobile. In the notice of deficiency the respondent disallowed this amount for each year. At the hearing the parties stipulated that the allowable depreciation on the automobile for each of the years is $508.81. Business Expenses for 1948, 1949, and 1950 The petitioner has been closely associated with amateur *144 athletics and at the time of the hearing was president of the Amateur Athletic Union of the United States. He sponsors a weight lifting club known as the York Bar Bell Club located in York, Pennsylvania. He was a former weight lifter and trained many weight lifting champions. It has been his practice to train free of charge any young man who shows the potential of becoming a champion and to defray his expenses of going to York for training and for competing in amateur meets if he becomes a member of the York Bar Bell Club. He has a house about four miles from York, Pennsylvania, where weight lifters stay and train. This house is equipped with a small gymnasium room and there is also an outside swimming pool and a track for training purposes. Most of the members of the United States weight lifting teams, as well as the United States Olympic team were members of the York Bar Bell Club. There were generally at least three important weight lifting meets per year and on those occasions contestants would come to York to train and to be coached by the petitioner. In addition, the petitioner also holds shows in York. While the men were in training in York, Pennsylvania, petitioner housed them, *145 fed them, paid their medical expenses, furnished them transportation to and from York, and paid the expenses for towels, bed linens, and other necessities. In 1948 the petitioner was the official coach of the United States Olympic team. The whole team of approximately 8 or 10 men lived and trained in York for about 5 weeks prior to the holding of the Olympic Games, and the petitioner paid the expenses. The petitioner also housed and fed the United States weight lifting teams in 1949 and 1950, but for shorter periods of time. In 1948 the petitioner paid some expenses incurred abroad by the Olympic weight lifting team. Also, in 1949 and 1950 the petitioner paid for the transportation and other expenses of the United States weight lifting team competing abroad. The petitioner, as stated hereinabove, travelled extensively in connection with weight lifting meets and on sales trips. The funds used for all the foregoing purposes were drawn from business receipts, were charged as expenses, and claimed as deductions. In his income tax returns for the years 1948, 1949, and 1950 the petitioner claimed ordinary and necessary business expense deductions in the respective amounts of $94,133.56, *146 $87,719.62, and $76,827.31. These included travel expenses in the respective amounts of $4,515.02, $9,678.71, and $7,223.69. Of the claimed business expenses the respondent, in the notice of deficiency, disallowed the respective amounts of $11,816.13, $17,302.41, and $15,387.99. Therein the respondent made proper adjustment for depreciation on such of the disallowed expenditures as he determined should be properly capitalized. At the hearing the parties stipulated in detail with respect to which of the items disallowed by the respondent were properly disallowed and which were improperly disallowed. They also stipulated which of the properly disallowed items constituted capital items subject to depreciation, agreeing that the depreciation adjustment should be computed in connection with the recomputation under Rule 50. All these stipulations are incorporated herein by reference. There remained certain items paid out of business income and charged on the books, but disallowed by the respondent, as to which the parties did not stipulate. These were as follows: 1948
Cosmos Travel Agency
$ 165.00
White Rose Motor Club
636.16
Charles A. Smith
600.00
United States Olympic Association
623.50
$2,024.66
1949
Thomas Cook and Son
$ 600.00
Thomas Cook and Son
320.00
Thomas Cook and Son
1,176.00
Thomas Cook and Son
1,378.80
$3,474.80
1950
Cosmos Travel Bureau, New York
$1,137.60
*147 The above listed expenditures for 1948 were for the following purposes: $165.00 to Cosmos Travel Bureau for travel expenses of one of the members of the United States Olympic team; $636.16 to White Rose Motor Club for travel expenses of John Grimek, an employee of petitioner, in going to England to participate in the "Mr. Universe" contest, which he won; $600.00 to Charles A. Smith in exchange for English pounds which were used by the United States Olympic weight lifting team for expenses while they were abroad; $623.50 to United States Olympic Association for transportation of Ray VanCleef, an employee of petitioner, to attend the Olympic team as assistant coach and as associate editor of Strength and Health Magazine for the purpose of acquiring material to be used in subsequent issues of that magazine. The above listed payments to Thomas Cook and Son in 1949 were for travel expenses of 8 men to compete for the world championship at Amsterdam, Holland, under the sanction of the International Weight Lifting Federation. The team was comprised mainly of York Bar Bell Club members and competed as the York Barbell team, representing the United States. The $1,137.60 paid to Cosmos Travel *148 Bureau in 1950 was in part payment for round trip airline tickets from New York to Paris for 8 men comprising the York Bar Bell Club who competed in the world championship held in Paris that year. At the Olympic Games held in 1948, and in other world championship meets, large numbers of bars and barbells manufactured by the petitioner were sold for competition and training. All of petitioner's products are permanently embossed showing that they were manufactured by the York Barbell Company. Contacts made by the petitioner and his employees at the Olympic Games and world championship meets resulted in obtaining customers in many foreign countries. Sometimes sales are made at such meets. The petitioner did no direct advertising in foreign countries, although in his capacity as a United States weight lifting coach and promoter of weight lifting he was often written up in newspapers and magazines. Numerous articles were published in the Strength and Health Magazine discussing the 1948 Olympic Games and the world championships held abroad in 1949 and 1950. The success of the petitioner's barbell business has been due, to a substantial extent, to the personal contacts made in the manner *149 above described and through demonstration that petitioner's products and methods of training are superior. This has been demonstrated by publicizing the fact that winning weight lifters were trained by the petitioner and used York barbell equipment. The above expenditures were made primarily for the purpose of furthering sales of equipment by the petitioner's businesses and for the purpose of obtaining material for publication in the Strength and Health Magazine. Estimated Taxes Petitioner in 1948, 1949, and 1950 filed declarations of estimated tax and paid taxes shown thereon in the respective amounts of $8,000.00, $7,006.51, and $8,800.20. Opinion The respondent, by use of the so-called cash expenditures method, determined large deficiencies in income tax against the petitioner for the years 1948, 1949, and 1950 and also determined additions to tax under section 293(b) of the Internal Revenue Code of 1939, in the amount of 50 per cent of such deficiencies, on the ground that some part of each deficiency was due to fraud with intent to evade tax. Upon the issue of fraud the burden of proof was, of course, upon the respondent. Section 1112 of the Code. On brief the respondent stated *150 that he "waived" the additions to tax under section 293(b). We accordingly disapprove the respondent's determination insofar as it involves the additions to tax. There remains for consideration the question of the correctness of deficiencies in tax determined by the respondent. The cash expenditures method which the respondent used has received judicial approval in a number of cases. United States v. Johnson, 319 U.S. 503; United States v. Caserta, (C.A. 3) 199 F. 2d 905; Viles v. Commissioner (C.A. 6) 233 F. 2d 376, affirming a Memorandum Opinion of this Court; Goldberg v. Commissioner (C.A. 5) 239 F. 2d 316, affirming in part a Memorandum Opinion of this Court; and Olinger v. Commissioner (C.A. 5) 234 F. 2d 823, affirming in part a Memorandum Opinion of this Court. [1] *151 *152 The petitioner takes the position that the use of the cash expenditures method by the respondent is capricious and unwarranted unless no books and records are kept or such are inadequate, or the respondent has been denied access to the books and records. The evidence shows that the petitioner's bookkeeper kept records for the business activities and also some records of the petitioner's financial transactions not connected with the businesses. It also appears that the returns were based on such records. However the records were not put in evidence and there is only meager evidence with respect thereto. In any event it has been repeatedly held that use of the net worth method is not precluded even though books are kept and even though on their face they may appear to be accurate, since the method itself is a test of the accuracy of the books and records. *153 Holland v. United States, 348 U.S. 121; Schwarzkopf v. Commissioner, (C.A. 3) 246 F. 2d 731, affirming a Memorandum Opinion of this Court; Davis v. Commissioner, (C.A. 7) 239 F. 2d 187, affirming a Memorandum Opinion of this Court, certiorari denied 353 U.S. 984; Morris Lipsitz, 21 T.C. 917, aff'd (C.A. 4) 220 F. 2d 871, certiorari denied 350 U.S. 845; and William G. Lias, 24 T.C. 280, aff'd (C.A. 4) 235 F. 2d 879, certiorari denied 353 U.S. 935. We think the same is true of the cash expenditures method, and see no error on the part of the respondent in using such method. Nor do we think that this method should be restricted to cases of income derived from an illegal business or source, as the petitioner seems to argue. The petitioner also argues that the respondent failed to meet the requirements of such expenditures method in that he failed to establish an opening net worth or to give the petitioner credit for any available funds as of the beginning of the period. He also complains that respondent did not at any time prove a likely source of income or negate the existence of nontaxable receipts by the petitioner during any of the years involved. We recognize, of course, *154 that courts should carefully scrutinize cases involving determinations made on the net worth and related methods of reconstructing taxable income because of the pitfalls inherent in such methods and because of the difficulty that the taxpayer may in some cases encounter in refuting determinations made by the respondent by those means. Holland v. United States, supra. However, the respondent's determination of a deficiency in tax (as distinguished from any determination of additions to tax for fraud, not now involved) bears a presumption of correctness, and the burden of proof is upon the petitioner to show error therein. This is fundamental and is established by numerous decisions of the Supreme Court and the Courts of Appeals. Welch v. Helvering, 290 U.S. 111, and Helvering v. Taylor, 293 U.S. 507. See also Rule 32, Rules of Practice of this Court. And this applies as well to determinations made by the net worth, cash expenditures, and bank deposits methods. [2] *156 *157 We cannot assume that in determining the deficiencies in tax the respondent failed to make a proper investigation, that he ignored any leads as to both taxable and nontaxable sources of income, or that he failed to take *155 into account the assets which the petitioner had at the beginning of the period. The fact that the respondent did not, in the deficiency notice, set forth any net worth computations is not indicative of a failure to take into consideration available funds on hand. The burden was upon the petitioner to adduce proof to show any infirmities in the respondent's determination. The petitioner contends that in any event he has proved certain errors which the respondent made in determining the deficiencies and that those errors, coupled with those which the respondent has conceded that he made, are sufficient to warrant the conclusion that the petitioner has overcome the presumption of correctness of the respondent's determination, that such determination was erroneous, arbitrary and excessive, and that consequently there was no duty upon him to show his correct tax liability. He cites, among other cases, Helvering v. Taylor, supra; Harp v. Commissioner (C.A. 6), 263 F. 2d 139; Cohen v. Commissioner (C.A. 9), 266 F. 2d 5; Thomas v. Commissioner (C.A. 6), 223 F. 2d 83; and Clark v. Commissioner (C.A. 9), 266 F. 2d 698. *158 We do not read those cases as meaning that a showing of error as to some items in the respondent's determination relieves the petitioner of the burden of showing error as to other items. Indeed it has been held specifically that the petitioner has the burden of showing with respect to each item that the respondent was wrong. Anderson v. Commissioner (C.A. 5), 250 F. 2d 242, certiorari denied 356 U.S. 950, affirming a Memorandum Opinion of this Court; Goldberg v. Commissioner, supra; Clark v. Commissioner, supra.And it is to be noted that in Helvering v. Taylor, supra, only one item was involved. We have given careful consideration to all the evidence presented and have disapproved the respondent's determination as to those items with respect to which the evidence shows he was in error. We approve his determination as to items where there was no evidence, or the evidence was insufficient to prove error. The items which the petitioner specifically contests will be discussed separately. Funds Available at January 1, 1948 The petitioner alleges that any expenditures which he made in the years in question over and above his current sources of funds in those years were made from *159 capital accumulated prior to January 1, 1948, that the respondent did not take into account the funds available at that time, and that hence he improperly applied the cash expenditures method. In attachments to the notice of deficiency, as to each of the years, the respondent set out in detail the "sources of funds" which he could ascertain or identify as having been available for the expenditures which he determined had been made. There are not specifically included any funds accumulated as of January 1, 1948. As stated, we cannot assume that the respondent ignored this important factor in determining the petitioner's income under this method. We think that it was necessary that the petitioner, in order to prevail, adduce some proof which would reasonably indicate error on the part of the respondent in this respect. This he has not done. There is no direct evidence of any available funds on hand at January 1, 1948, either in the possession of the petitioner or in his businesses. Although the petitioner, who presumably would be in the best position to know the sources of the funds expended, was in the court room at the time of the trial, he did not see fit to take the stand and give *160 testimony as to such sources. [3] No business records or bank statements or testimony of the bookkeeper or others were introduced upon this subject. The only evidence presented bearing on this allegation consisted of petitioner's income tax returns for the years 1929 to 1950, inclusive, and evidence generally showing successful business operations. In the returns for the years 1929 through 1947, the petitioner reported net income of $384,748.88 on which he paid income taxes and interest totaling $94,911.01 (plus some undisclosed amount for 1933). The returns show that depreciation was taken over those years in the total amount of $36,371.42. On brief the petitioner points out that when the depreciation is added back to net income remaining after payment of the income taxes, there remained a very substantial source of funds available for acquisition of assets and for personal living expenses. This evidence, in our opinion, falls short of showing that there were on hand at January 1, 1948, available funds which the petitioner could thereafter use in making his expenditures in the taxable years. It is true, of course, that the petitioner carried on large business operations and it is reasonable *161 to suppose that at times there may have been on hand in the businesses substantial amounts of cash. We also note from the respondent's computation that on January 15, 1948, the petitioner paid income taxes in the amount of $3,937.97 which might tend to indicate that the money so used, or part of it, was on hand at January 1, 1948. However, if there was on hand at that time in petitioner's businesses or in his possession any substantial amount of available funds we think the burden was on him to make some more specific showing than he has made, rather than leave the decision upon this important point to speculation or inference. Furthermore, for all that the record shows, * the respondent may have indirectly made some allowance for funds on hand in the businesses at the beginning of 1948. He has given the petitioner credit for $26,062.69 as withdrawals from his business in 1948. We do not know when these withdrawals were made, but they may well include withdrawals of such funds as might have been available at January 1, 1948. Nor has petitioner shown that any business or nonbusiness assets on hand as of January 1, 1948, were converted during the years in question, other than as held *162 by the respondent, so as to provide funds available for expenditure. We note that his return for 1947 shows depreciable assets (buildings, furniture and fixtures, machinery and equipment, and automobiles and trucks) with a basis of approximately $110,000. However, his returns for the years 1948, 1949, and 1950 would seem to indicate that these remained intact, since these items increased rather than decreased over the years in question. It is our conclusion that the petitioner has not borne his burden of showing that his excess expenditures in the years in question were made, except as recognized by the respondent, *163 out of capital accumulated prior to January 1, 1948. Payments to Rosetta Morris In his computation the respondent included among cash expenditures for the years 1948, 1949, and 1950 the respective amounts of $5,100, $5,200, and $5,200 as payments made to Rosetta Morris, petitioner's former wife. The petitioner contends that the only payments made were $100 in 1948 and $200 in 1950, which were made by check. The respondent put into evidence returns of Rosetta Morris to show that she had received a salary of $5,200 per year from Strength and Health Publishing Company in the years 1938 to 1941 when she was married to the petitioner and was employed in his business. However, the petitioner introduced evidence to show that he was divorced from Rosetta Morris in 1945, he paid her an amount of $30,000 as a divorce settlement, and that in the years in question she was not employed in any of his businesses. The respondent introduced no further evidence upon the subject. The evidence, while not as full as might be desired, is, in our opinion, sufficient to show error on the part of the respondent in this respect. Accordingly, in the recomputation these amounts will be eliminated from the expenditures *164 made by the petitioner in the years in question. Investments in and Loans to York Precision Company The parties have entered into a stipulation, the effect of which is that the respondent erred in including loans of $52,100 by petitioner to York Precision Company in 1948 and that the correct amount of loans was $27,800 in 1948 and $14,120 in 1950. They have also, in effect, stipulated that the respondent erred in determining that the petitioner invested $20,000 in York Precision Company in 1948 and that in lieu thereof there should be included an amount of $10,000 as petitioner's investment in that company in 1949. These stipulations will be given effect in the recomputation. Mortgage Payments to George W. Deardorff In his computation for 1950 the respondent charged the petitioner with cash expenditures of $4,400 representing mortgage payments to George W. Deardorff, noting that this was paid in two installments, $2,400 on April 7, 1950 and $2,000 on May 26, 1950. The petitioner introduced in evidence a check dated April 6, 1950, drawn by the petitioner on the business bank account of Strength and Health Publishing Company in the amount of $2,055 payable to Deardorff. This check, *165 to the extent of $2,000, represented payment of principal of the mortgage and $55 represented interest. It seems reasonable to conclude that the respondent in his computation reversed the dates of the two payments, and that in reality the $2,000 payment to which he had reference was made by this check, rather than by cash. Accordingly, it is our conclusion that the respondent erred in including the $2,000 payment as a cash expenditure by petitioner. Since the payment was made out of the funds contained in the business bank account we think it reasonable to conclude that the business receipts represented by this account must have been reflected in the business records upon which the returns were based. Upon the recomputation the amount of $2,000 will be eliminated from the cash expenditures for the year 1950. J.L. See Transaction We have concluded and have found as a fact that the respondent was in error in holding that the petitioner made a cash expenditure of $20,000 in the purchase of stock from J.L. See in 1949. The testimony establishes that only $3,000 was paid in cash (an undisclosed amount of the purchase price having been paid through cancellation of indebtedness owing to *166 petitioner) and that this $3,000 was paid from funds which petitioner borrowed from a bank. If the $3,000 cash paid for the stock were included among expenditures it would be necessary to increase the available funds by the $3,000 borrowed from the bank. Since this would result in no net effect upon the overall computation, we consider it unnecessary to make those two revisions. However, since the petitioner repaid the bank and the source of the funds used for repayment is not shown, there should be included in the recomputation the cash expenditures made by the petitioner in 1949 and 1950 in repaying the bank, namely, $1,000 in 1949 and $2,000 in 1950. Cash Living Expenses In his computation the respondent charged the petitioner with "Cash living expenses" of $20,000 in each of the years in question. The facts clearly demonstrate that the petitioner was not extravagant in his living habits, but, on the contrary, was quite frugal. The bookkeeper Dietz testified that in his opinion the petitioner did not spend over $40 per week for personal expenses. The testimony of the petitioner's business manager, John B. Terpak, and four weight lifters who were associated with the petitioner, *167 was to the effect that petitioner's personal expenditures would be between $25 and $30 per week. Dietz testified that the individual personal expenditures of the petitioner would not appear in any record which was kept. We are satisfied that the amount of personal living expenses determined by the respondent is excessive. On the other hand, the amount which the petitioner did spend cannot be determined with exactitude from this record. In this situation we think that we must exercise our best judgment and arrive at the best estimate possible. Cohan v. Commissioner (C.A. 2), 39 F. 2d 540. This we have done, and have concluded and found as a fact that the petitioner's cash living expenses amounted to $5,000 in each of the years 1948, 1949, and 1950. That amount will be used in the recomputation in lieu of the amount used by the respondent. It may be added that on brief the respondent, although not so stating specifically, implies that there should be included in "Cash living expenses" certain expenditures made by the petitioner in maintaining weight lifters at York, and in taking them to meets at home and abroad. However, as appears elsewhere herein, the evidence shows that the amounts *168 expended for these purposes were taken from the funds of the business and were treated by the petitioner as ordinary and necessary business expenses. They formed no part of the petitioner's personal living expenses. Invoice of Cosmos Travel Bureau In his computation for the year 1950, the respondent included as a cash disbursement the amount of $3,500 which John Valentine of Leeds, England, paid to one of the airlines in London. This represented an amount which was owing by Valentine to the petitioner or his business for merchandise furnished over prior years. The effect of the respondent's inclusion of this as an expenditure was to increase the taxable income of the petitioner for the year 1950, inasmuch as respondent did not credit petitioner with this same amount as a source of available funds. It appears from the testimony of the accountant Merves that the sales giving rise to this indebtedness had never been included in petitioner's sales and hence no part had been reported as income. In his testimony Merves conceded that this item should be considered as taxable income in 1950 (presumably because the petitioner in prior years had deducted cost of the goods sold), but he stated *169 that it was not included for the reason that the petitioner would be entitled to deduct the same amount as an ordinary and necessary business expense. As will appear infra, there was a balance of $1,137.60 paid to Cosmos Travel Bureau in payment for the air passages which we hold is deductible as an ordinary and necessary business expense. For the same reason the $3,500, if taken into income, would be offset by an equal deduction. Since the two items would offset each other, we think that for purposes of the computation the credit need not be taken into account. Accordingly in the recomputation this item of $3,500 will be eliminated from the petitioner's disbursements of 1950. Deposits in Petitioner's Personal Account The respondent in computing the unreported income of the petitioner for the years 1948 and 1949 added to the income computed on the cash expenditures method the respective amounts of $15,272.31 and $8,547.20 as being deposits to petitioner's personal account not reported. The amount deposited in 1948 has been stipulated as $14,850.42. The petitioner adduced evidence to show that the respondent was incorrect in this respect. The accountant Merves testified that he had *170 traced these deposits and had found that for each year they consisted of the amounts of rent which the petitioner had reported on his income tax returns and of receipts from sales which had also been reflected in the petitioner's returns. He stated that in tracing these amounts he had used the work sheets used by the bookkeeper in preparing the returns and that such work sheets were available. Furthermore, it appears that all the books and records of the petitioner were in the court room. We have no reason for doubting the credibility or accuracy of Merves' testimony. The respondent did not attempt to controvert this testimony in any manner. Under the circumstances we think that the petitioner has established error on the part of the respondent in increasing reported income by deposits to his personal account in 1948 and 1949. In his computation as to each of the years 1948, 1949, and 1950, the respondent, under sources of available funds, credited the petitioner with the gross amount of rental income which he had reported in his returns. Merves testified that in each instance the rental income had been deposited in the petitioner's personal account and that it was therefore not available *171 as cash to explain the expenditures found by the respondent. He stated that it was available to him through the use of checks, but that the respondent had given credit against expenditures for checks drawn on the personal account. From the record this appears to be a proper interpretation of the method used by the respondent. Thus this was an error of the respondent which operated to the benefit of the petitioner. This is conceded by the petitioner on brief. Having eliminated the duplication of this rental income, we think that in fairness to the respondent and in order to correctly compute income by this method, the respondent's computation should be revised in his favor to also eliminate the duplication of the rental as a source of funds available for expenditure. Accordingly in the recomputation the rental will be eliminated from "Sources of Funds" for each year. Rental Due from York Precision Company
The petitioner had rented to York Precision Company a building for $3,600 per year and in each of the years 1948, 1949, and 1950 this amount became due and payable. However, it was not paid during those years. The respondent recognizes that this amount was not actually paid to the *172 petitioner in the years in question, but argues on brief that he correctly increased petitioner's reported income by this rental, since in the years in question the petitioner deducted expenses in connection with the property. It is well established that a taxpayer may keep his records and report business income on one method of accounting and income from nonbusiness transactions on a different basis. Joseph Stern, 14 B.T.A. 838; Berryman D. Fincannon, 2 T.C. 216; and David Hanover, 12 T.C. 342. In the instant case it appears that the petitioner's bookkeeper had regularly kept records of the petitioner's nonbusiness transactions on the cash receipts and disbursements method. Although the record shows that the petitioner owned some interest in the York Precision Company, there is no basis for concluding that York Precision Company had cash available for payment of the rent and that the petitioner purposely refrained from receiving it. Rather, Merves' testimony would indicate that failure to pay was due to financial inability on the part of the York Precision Company. It is our conclusion that the respondent erred in increasing the petitioner's income for each of the years in question *173 by $3,600 of rental. Allowable Depreciation and Business Expense Deductions for 1948, 1949, and 1950 As stated in the Findings of Fact, the parties have stipulated the amount of depreciation allowable on an automobile owned by the petitioner and also stipulated generally the ordinary and necessary business expense deductions which are allowable. They have also agreed that certain items which have been disallowed as deductions are to be capitalized, with a consequent effect upon allowable depreciation which they have agreed will be computed in the recomputation under Rule 50. All stipulations will be taken into account in the recomputation. There was left for consideration the question of the deductibility of various amounts totaling $6,637.06 expended in the years 1948, 1949, and 1950 to send the petitioner and his employees, as well as members of the York Bar Bell Club, abroad to attend the Olympic Games and other contests, as set forth in our Findings of Fact. The respondent agrees that these expenditures were made, leaving only the question as to the deductibility thereof. The reasons for these expenditures are set forth in detail in our Findings of Fact. We are satisfied that *174 the primary purpose in expending these amounts was to further the business of the petitioner in selling his weight lifting and other equipment and to provide material for articles to be published in the Strength and Health Magazine. Accordingly, it is our conclusion that all these items are properly deductible as ordinary and necessary business expenses. See Sanitary Farms Dairy, Inc., 25 T.C. 463. Additions to Tax Under Section 294(d)(2) We have set forth in the Findings of Fact the amounts of estimated tax which the petitioner reported for each year. The amounts of any additions to tax on account of underestimation of estimated tax pursuant to section 294(d)(2) of the Code will be recomputed under Rule 50 upon the basis of the tax resulting from the decisions made herein. Statute of Limitations On brief the petitioner for the first time makes the contention that under section 275 of the Code, assessment and collection of any deficiencies for the years in question are barred by the statute of limitations, calling attention to the fact that the return for each year was timely filed and that the notice of deficiency was not mailed until June 29, 1956. In the petition there was no *175 allegation or statement of fact with respect to the question of the statute of limitations, and at the hearing no mention was made thereof. We have often held that the statute of limitations is unavailable to a petitioner as a defense against assessment and collection unless the issue has been raised by the pleadings. Rule 7(c)(2) of the Rules of Practice of this Court; Given v. Commissioner (C.A. 8), 238 F. 2d 579, affirming a Memorandum Opinion of this Court; United Business Corporation of America, 19 B.T.A. 809, affd. (C.A. 2), 62 F. 2d 754, certiorari denied 290 U.S. 635; and Robert G. Robinson, 12 T.C. 246, affd. (C.A. 5), 181 F. 2d 17. The respondent in his reply brief points out that no issue of the statute of limitations has been raised in the pleadings, but requests that if this Court should consider the limitations question, the case be reopened for the purpose of permitting him to put into evidence waivers of the statute of limitations filed by the petitioner for each of the years. In view of our conclusion that the issue is not before us, there is no necessity for reopening the record. Decision will be entered under Rule 50. Footnotes
1. 52 X $100 = $5,200, less check paid from Strength & Health $100 = $5,100. ↩
2. $2,400 on 4-7-50; $2,000 on 5-26-50.↩
1. In the Caserta case, which involved a criminal prosecution, the Court stated in part: An outgrowth of this net worth method is the "expenditure" test involved in this case. The theory of it is simple, though its application may become difficult. It starts with an appraisal of the taxpayer's net worth situation at the beginning of a period. He may have much or he may have nothing. If, during that period, his expenditures have exceeded the amount he has returned as income and his net worth at the end of the period is the same as it was at the beginning (or any difference accounted for), then it may be concluded that his income tax return shows less income than he has in fact received. In the Viles case, the Court stated: Under the circumstances in this case the use of the cash expenditure method for the purpose of determining the taxpayer's adjusted gross income was authorized. United States v. Johnson, 319 U.S. 503, 517, 63 S. Ct. 1233, 87 L. Ed. 1546, rehearing denied 320 U.S. 808, 64 S. Ct. 25, 88 L. Ed. 488; Cohen v. Commissioner, 10 Cir., 176 F. 2d 394, 398-399; Halle v. Commissioner, 2 Cir., 175 F. 2d 500, 502-503. See Doll v. Glenn, 6 Cir., 231 F. 2d 186. In the Goldberg case, the Court said: * * * Most of the increase in taxable income as determined by the Commissioner resulted from computations made by the so-called "Cash expenditures method." This method of reconstructing income is an extension or outgrowth of the net worth method. It starts with a valuation at the beginning of the period of the taxpayer's assets. If that which has been spent exceeds that which has been reported as received the inference is justified that the difference is unreported income. It is not an accurate method and its results are at best approximations. Its use is permitted where the taxpayer's records are so inadequate as to require that resort be had to some other means of reaching a determination. See Mertens, Federal Income Taxation, § 12.12.
2. In the Viles case the court stated: * * * But the burden was not upon the Commissioner to sustain the assessment, which established a prima facie case of liability. The burden rested upon the taxpayer to show that the Commissioner's determination was invalid. Durkee v. Commissioner, 6 Cir., 162 F. 2d 184, 187; Helvering v. Taylor, 293 U.S. 507, 55 S. Ct. 287, 79 L. Ed. 623; Thomas v. Commissioner, 6 Cir. 223 F. 2d 83, 88. Disregarding the hearsay evidence, petitioner's evidence was clearly insufficient to meet this burden. In the Goldberg case the court stated: The petitioner argues that the Commissioner's computation by the cash expenditures method was arbitrary and inaccurate, that the petitioner and the decedent must have had substantial funds on hand at the beginning of the period, and that the expenditures during the period might have been made from previously accumulated funds. We need not review the facts and the conflicts of evidence and the differences between the inferences drawn by the petitioner on the one hand and the Commissioner on the other. We find nothing that deprives the Commissioner's determination of the usual presumption of correctness. The burden of showing the Commissioner was wrong rested upon the petitioner. To the extent he demonstrated errors in the Commissioner's computation he was given relief by the Tax Court. * *. In O'Dwyer v. Commissioner (C.A. 4), 266 F. 2d 575, affirming 28 T.C. 698, the court stated: The Tax Court had no information or evidence before it as to the source or nature of either deposit, but it was confronted with the presumption of correctness attaching to the Commissioner's determination that this particular deposit represented taxable income. * * * All taxpayers had to do in order to overcome the presumption of correctness was to make some reasonable explanation as to the source and nature of the deposit in question. The presumption existed, the Commissioner's determination was prima facie correct and the burden was upon the taxpayers in the Tax Court to overcome this presumption. See Hoefle v. Commissioner, 114 F. 2d 713. In Valetti v. Commissioner (C.A. 3), 260 F. 2d 185, affd. in part 28 T.C. 692, the Court of Appeals stated: * * * It is the burden of a taxpayer who institutes such a suit as this to overcome the presumption that the Commissioner's deficiency finding was correct by showing a preponderance of evidence that the Commissioner erred. Snell Isle v. Commissioner, 5th Cir. 1937, 90 F. 2d 481↩ * * *.
3. Reference is also made to the rule that failure of a party to introduce evidence within his possession gives rise to the presumption that if produced it would be unfavorable to him. See Wichita Terminal Elevator Co., 6 T.C. 1158, affd. (C.A. 10), 162 F. 2d 513; Stoumen v. Commissioner (C.A. 3), 208 F. 2d 903, affirming a Memorandum Opinion of this Court; and William O'Dwyer, 28 T.C. 698, affd. (C.A. 4), 266 F. 2d 575. a1 The words "records show" were amended to read "record shows" by an official order of the Tax Court, dated August 1, 1960 and signed by Judge Atkins↩.